In the Matter of: B.L.W., a Minor, Appellee.

Appeal of: N.W., Mother, Appellant.

Superior Court of Pennsylvania.

Argued June 23, 2003.

Filed Feb. 12, 2004.

Elizabeth A. Hoffman, Harrisburg, for appellant.

Jason Kutulakis, Carlisle, for appellee.

BEFORE: DEL SOLE, P.J., JOHNSON, HUDOCK, MUSMANNO, LALLY–GREEN, KLEIN, BENDER, BOWES and GRACI *, JJ.

OPINION BY BOWES, J.:

¶ 1 N.W. ("Mother") appeals from the order of the Court of Common Pleas of Dauphin County involuntarily terminating her parental rights to her daughter, B.L.W. We have reviewed the notes of testimony and considered Mother's arguments and the applicable law. We affirm.

¶ 2 We summarize the factual and procedural history. Dauphin County Social Services for Children and Youth ("Dauphin CYS") first became involved with B.L.W. in May 1998, when it received allegations that Mother and J.C.W., Sr. ("Father"), had engaged in inappropriate sexual conduct with B.L.W., born September 23, 1992, and J.C.W., Jr., born March 26, 1984. Dauphin CYS sent a caseworker to conduct an unscheduled home visit on May 18, 1998. J.C.W., Jr. was on an overnight trip with his school. However, the caseworker spoke to B.L.W. who reported that Mother and Father had fondled her vagina, B.L.W. had fondled Father's penis, and her par-

---

* Judge GRACI did not participate in the decision of this case.

ents engaged in sexual activity in the children's presence. N.T., 8/29/01, at 9.

¶ 3 The investigation also revealed a storage box belonging to Father which contained items that appeared to be child pornography. Juvenile Court Summary, 6/9/98, at 1; N.T., 8/29/01, at 13. In addition, Dauphin CYS found a sound-activated tape recorder in the home's only bathroom and quarter-sized holes in the bathroom wall that corresponded with holes in the parents' bedroom wall. N.T., 8/29/01, at 9, 129–30. Dauphin CYS later determined that while family members used the bathroom, Father would record their activities and later would masturbate while listening to the recordings. On some occasions, he would directly observe family members in the bathroom by viewing them through the holes in the wall. *Id.* at 9–10, 12. As a result of the allegations of abuse and the conditions that caseworkers observed in the home, Dauphin CYS immediately placed B.L.W. in protective custody. N.T., 8/29/01, at 10.

¶ 4 The following day, May 19, 1998, the caseworker located and ·interviewed J.C.W., Jr., who told the Dauphin CYS caseworker that Mother and Father had engaged in sexual activity with another couple in front of J.C.W., Jr. and B.L.W. Juvenile Court Summary, 6/9/98, at 2; N.T., 8/29/01, at 13. Dauphin CYS immediately placed J.C.W., Jr. into shelter care. Mother informed Dauphin CYS that she and Father maintained a long-standing relationship with another couple with whom she and Father had an open sexual relationship, that Father engaged in sexual activity with the other woman in front of both Mother and the children, and that the other couple lived with Mother and her family at the time of the referral. N.T., 8/29/01, at 131. Mother knew that the male in the other couple had been convicted of possession of child pornography in

1987. N.T., 8/29/01, at 132. Mother also knew of the holes in the bathroom wall and the sexual activity that took place in front of the children, but she did not intervene to curtail the behavior. However, Mother denied fondling B.L.W. or witnessing anyone else fondle the child. She speculated that any inappropriate sexual touching involving B.L.W. likely would have been perpetrated by the other couple or Father. Juvenile Court Summary, 6/9/98, at 2–3; N.T., 8/29/01, at 13.

¶ 5 A detention hearing was held on May 21, 1998, and an adjudication hearing was held on June 26, 1998. After the adjudication hearing, both J.C.W., Jr. and B.L.W. were declared dependent and were placed in the legal custody of Dauphin CYS on June 26, 1998. N.T., 8/29/01, at 11. A family reunification plan was put into place requiring Parents to: (1) undergo psychological evaluations and abide by any recommendations; (2) participate in therapy together regarding the roles and boundaries surrounding sexuality; (3) implement changes to repair the bathroom walls immediately; (4) clean and organize the living areas of the house and B.L.W.'s bedroom to allow for private areas; and (5) participate in STEP parenting classes. *Id.* Over the ensuing six months, Father failed to comply with the plan and left the home to live with his girlfriend. *Id.* at 13. Parents have been separated since August 1999.

¶ 6 In July 1998, Dauphin CYS made an "indicated" finding of sexual abuse pursuant to the Child Protective Services Law, 23 Pa.C.S. § 6301 *et seq.;* that finding was not appealed by either party. N.T., 8/29/01, at 10. Mother's son, J.C.W., Jr., was returned to her care and custody in June 2000. He was sixteen years old at the time and is not involved in this appeal. B.L.W. has remained in Dauphin CYS custody since her 1998 placement and had

resided in the same foster home for nearly four years by the August, 2001 hearing. *Id.* at 49. On May 31, 2000, the orphans' court changed the permanency goal for B.L.W. from reunification to adoption.

¶ 7 Mother moved to Mt. Carmel, Pennsylvania, in 2000 with J.C.W., Jr. The residence there has been deemed neat, well-kept, and without physical safety issues. While in Mt. Carmel, Northumberland County Children and Youth Agency ("Northumberland CYS") assigned a caseworker to Mother based upon allegations that Mother was hitting J.C.W., Jr. N.T., 8/29/01, at 146. In addition, Northumberland CYS provided parenting classes and anger control counseling from November 2000 until April 2001. In February, March, and April 2001, Mother began counseling for sexual abuse but failed to complete the program.

¶ 8 Dauphin CYS filed a petition to terminate Mother's parental rights to B.L.W. on January 24, 2001, and a termination hearing was held on August 29, 2001. The Honorable Todd A. Hoover of Dauphin County Court of Common Pleas involuntarily terminated both parents' parental rights. Father's rights were terminated without contest, and he is not a party to the present appeal. Mother filed a timely notice of appeal on November 15, 2001.

¶ 9 Our scope and standard of review are settled.

When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. *See In re K.C.W.,* 456 Pa.Super. 1, 689 A.2d 294, 298 (1997). Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. *Id.* Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. *See In re Child M.,* 452 Pa.Super. 230, 681 A.2d 793, 800 (1996). We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence. *See In re Matsock,* 416 Pa.Super. 520, 611 A.2d 737, 742 (1992).

*In re C.S.,* 761 A.2d 1197, 1199 (Pa.Super.2000). It is clear that in a termination proceeding, the focus is on the conduct of the parents. *In the Interest of A.L.D.,* 797 A.2d 326 (Pa.Super.2002); *In the Interest of M.B.,* 449 Pa.Super. 507, 674 A.2d 702 (1996).

¶ 10 The court herein terminated parental rights based upon 23 Pa.C.S. § 2511(a)(1), (2), (5), and (8). Those sections provide as follows:

### § 2511. Grounds for involuntary termination

(a) **General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . . .

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

. . . .

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

¶ 11 Mother contends[1] the trial court erred in determining that Dauphin CYS met its burden of proof under 23 Pa.C.S. § 2511(a) (1), (2), (5), and (8) and erred in "making other considerations under 23 Pa.C.S. § 2511(b)." Mother's brief at 4. While the trial court found that Dauphin CYS met its burden of proof under each section quoted above, we need only agree with its decision as to any one subsection in order to affirm the termination of parental rights. *In re J.E.*, 745 A.2d 1250 (Pa.Super.2000); *see also In re J.I.R.*, 808 A.2d 934, 940 n. 6 (Pa.Super.2002). For the following reasons, we conclude that the trial court correctly concluded that Appellee met its burden of proof under 23 Pa.C.S. § 2511(a)(2).

¶ 12 Mother began attending counseling sessions with Pennsylvania Counseling Services at the Renaissance Counseling Center in Lebanon, Pennsylvania, in September 1998, with staff therapist Mr. Jan Edwards. Mr. Edwards testified the sessions terminated in June 1999, when Father ceased to provide Mother with transportation to the sessions. *Id.* at 71. He also testified that Mother was cooperative with counseling but that the therapy never progressed to a phase where paren-

---

1. To the extent that Mother focused at oral argument upon the reasonableness of the efforts of Dauphin CYS prior to seeking termination of Mother's parental rights, we note that Mother failed to raise such issue in both her statement of matters complained of on appeal and statement of questions presented. Moreover, even if properly raised, "the adequacy of CYS'[s] efforts toward reunification is not a valid consideration [at the termination of parental rights] stage, as the law allows CYS to 'give up on the parent' once the service plan goal has been changed to adoption." *In the Interest of A.L.D.*, 797 A.2d 326 (Pa.Super.2002); *accord In re Adoption of T.B.B.*, 2003 PA Super 398, 835 A.2d 387; *In the Interest of M.B.*, 388 Pa.Super. 381, 565 A.2d 804 (1989). The dissent suggests that there does not exist "a clear change of goal plan from which Mother could appeal," dis-

sent at 390, and it implies that we rely on the May 31, 2000 order attached to the Dauphin CYS brief as our support for the fact that the goal, indeed, was changed from reunification to adoption. As we do not have the juvenile court record before us, even though it was marked as an exhibit at trial, n.t., 8/29/01, at 13, we do not rely on this order. However, there is no doubt that the goal was changed to adoption. *See e.g.*, N.T., 8/29/01, at 52, 54, 58. Moreover, Mother never raised any issue suggesting that the goal was not changed nor that she had been denied any right to appeal. In light of the fact that we do not have the certified record from the juvenile court, coupled with Mother's failure to raise any issue concerning the reasonableness of the efforts toward reunification by Dauphin CYS in her Rule 1925(b) statement or her brief to this Court, such an argument is not before us.

tal roles and boundaries surrounding sexuality could be discussed. *Id.* at 68–70, 77, 79. After the therapy terminated in June 1999, Mr. Edwards decided not to enroll Mother in a parenting course to address that concern because Mother failed to demonstrate during nine months of treatment that she had any real capacity to address these complex issues. *Id.* at 72.

¶ 13 Mother returned to counseling at the beginning of May 2000, this time with Anthracite Behavioral Health Services in Mt. Carmel, Pennsylvania. *Id.* at 174. These sessions ended in mid-July. *Id.* at 25–26. Mother admitted that she did not address sexual roles and boundaries or basic parenting skills during this short period. *Id.* at 119–20.

¶ 14 The implications of Mother's limited success with counseling were verified by Dr. Howard Rosen, a psychologist who evaluated Mother on June 16, 1999. He measured Mother's full-scale IQ at sixty-two, which placed her in the mild range of mental retardation. Furthermore, Dr. Rosen found Mother to have a verbal IQ of only fifty-eight, with her lowest subscale scores coming from the vocabulary test and the comprehension subtest. *Id.* at 83–84. According to Dr. Rosen, the implications of this score are that Mother had minimal capacity to learn and benefit from counseling, therapy, or parenting classes. Based upon this fact, Dr. Rosen recommended that Dauphin CYS refer Mother to mental retardation services, which could provide her with alternative in-home services to improve her parenting. *Id.* at 87–88.

¶ 15 The trial court relied upon the following conclusions by Dr. Rosen in determining that grounds for termination under 23 Pa.C.S. § 2511(a)(2) have been met:

Dr. Rosen testified as to his concern that the mother is very vulnerable to the influence and suggestibility of others. He testified that the mother's description of her childhood and her sexual encounters in her childhood were consistent and verified the results of what has happened to her in her later life. (N.T. 86). Those matters related specifically to Dr. Rosen's concerns about her ability to protect the children or expose the children to things to which they should not be exposed. (N.T. 85, 1.19–22). Furthermore, Dr. Rosen testified that N.W. has very minimal abilities in social judgment which causes her to be vulnerable to the influence and suggestibility of others. (N.T. 85, 1.22–25–86, 1.1). He further opined that N.W.'s intellect, judgment and vulnerability are not going to change. (N.T. 86). Dr. Rosen diagnosed N.W.'s intellectual ability in the mild range of mental retardation and that her intellectual abilities will be a constant factor not likely to increase. (N.T. 86, 1.6–9).

Dr. Rosen concluded by opining that N.W. needs considerable help in managing her (own) daily affairs, and particularly in managing emotionally charged or novel situations. (N.T. 87). He further recommended she be referred for mental retardation case management services, because those people can help N.W. access other needed services, and serve as a constant in her life, providing advice, counseling, and help in situations when she is under duress. N.W. also has a representative payee to assist her with her SSI payments. (N.T. 88, 1.11–13). In conclusion, Dr. Rosen opined that based upon his evaluation of N.W.'s level of function and I.Q., personality and mental health illness problems, her diagnosis and the child's needs in order to be returned safely based upon her sex and age, he would have concerns about N.W.'s ability to protect herself and others in the home. (N.T. 98, 1.12–24).

Trial Court Opinion, 4/12/02, at 5–6.

¶ 16 Mother asserts that her psychological assessment revealed that she was not a

good candidate for individual therapy due to her limited verbal reasoning skills and that Dr. Rosen instead recommended that she be afforded in-home support. However, the record does not demonstrate any likelihood that such therapy would enable Mother to overcome her limitations and to provide the essential parental care necessary to protect her daughter from possible future sexual abuse. Ms. Farah Ryan, the Northumberland CYS caseworker who had been involved with the family for more than a year, testified that in her opinion, B.L.W. was at high risk for potential future sexual abuse due to her age and inability to protect herself. Moreover, Dr. Rosen testified that "given [Mother's] history and her limited abilities, I would worry about her ability to protect herself and others in the home." N.T., 8/29/01, at 99.

¶ 17 The dissent contends that the record does not support our conclusion that Mother's incapacity cannot be remedied. The reason the children were removed from the home rested upon Mother's inability to protect them and her willingness to expose them to conduct from which they should be shielded. Dr. Rosen opined that Mother has "very minimal abilities in social judgment." *Id.* at 85. Moreover, he described Mother as being "very vulnerable to the influence and suggestibility of others." *Id.* at 85–86. Significantly, in terms of her ability, or more appropriately, disability, Dr. Rosen stated, "I don't think her situation is going to change." *Id.* at 86.

¶ 18 Dr. Rosen explained that Mother did not possess the mental acuity to understand and anticipate acceptable social behavior. *Id.* at 90. Furthermore, he described her as being unable to alter her behavior through verbal instruction and interaction; the only way to attempt to change Mother's behavior is by teaching her acceptable behavior through "role

playing, rehearsing, practicing and giving her feedback on how she performs." *Id.* at 90. However, Dr. Rosen acknowledged that the problem then arises "when novel situations come up, the generalization of the skills given her low performances[,] is problematic." *Id.* at 91.

¶ 19 This testimony by Dr. Rosen is crucial and cannot be ignored. A parent requires the ability to exercise judgments when novel situations arise, in order to ensure the safety of children. Every possible scenario in the realm of human behavior, especially depraved sordid behavior, cannot anticipatorily be taught. Mother's actions and inaction herein are perfect examples. No "appropriate support," dissent at 391, could have taught Mother the proper judgment necessary for the protection of B.L.W. when Father drilled holes in the wall for the purpose of satisfying bizarre sexual proclivities. No "appropriate support" anticipatorily could have taught Mother the proper judgment required to choose not to engage in sexual intercourse in front of her children. Dr. Rosen made it clear that Mother's disability is very difficult to remediate when novel situations arise. *Id.* at 91. The dissent intimates that after five years, Mother still could be referred for "appropriate support," when Dr. Rosen's testimony already has established such support cannot address Mother's mental disability when novel situations arise. The record clearly supports the conclusion that Mother simply does not have the capacity to protect B.L.W.

¶ 20 One only has to read Mother's testimony to get a sense of the intellectual limitations that impede her ability to provide B.L.W. with essential parental care and control. Mother admitted knowing that the man who was living in their home was a convicted child pornographer. *Id.* at 132. She admitted telling her family mem-

bers, whom she now claims could be a help and support to her if B.L.W. returned, that she wanted the child pornographer to leave, but stated they did nothing to help her. *Id.* at 133. Mother admitted knowing that Father was utilizing holes in the wall "to peek at other people that used the bathroom," but she did nothing to stop him. *Id.* at 137–38. Even if we ignored the evidence of Mother's sexual activity in front of the children because she continues to deny it, the record is very clear that Mother knew about Father's sexual activity in front of the children and failed to intervene. *Id.* at 134.[2]

¶ 21 There are many cases wherein the inability of the parent to provide children with the necessary care, control, and subsistence necessary for their physical or mental well-being cannot or will not be remedied. Clearly, in the instant case, despite Mother's stated desire to raise her child, her incapacity cannot be remedied. We stated in *In re B.L.L.*, 787 A.2d 1007, 1013 (Pa.Super.2001):

The statute permitting the termination of parental rights outlines certain irreducible minimum requirements of care that parents must provide for their children, and a parent who cannot or will not meet the requirements within a reasonable time following intervention by the state, may properly be considered unfit and may properly have his or her rights terminated.

■ ¶ 22 We have acknowledged the unfortunate and disheartening effect such action may have on parents; however, "that does not make it any less appropriate, for it is the needs and welfare of the child that are of paramount concern to this Court." *In re J.A.S.*, 820 A.2d 774, 782 (Pa.Super.2003). The record herein compels our conclusion that Mother is not capable of providing B.L.W. with a safe and healthy environment in which to live, and there is no evidence in the record that this fact could change. "A parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to per-

2. The dissent emphasizes the trial court's mischaracterization of Mother's testimony that she and Father tickled B.L.W. in inappropriate places on her body, contending the testimony actually was that she tickled her in appropriate places. First, such criticism is unnecessary herein since Mother's testimony actually was that she tickled B.L.W. on the leg, without identifying where on her leg the touching occurred. Presumably, especially in light of Mother's limited intelligence, the trial court may have considered this testimony vague insofar as establishing unacceptable contact. Moreover, it was Mother's **counsel**, not Mother, who characterized the tickling in "appropriate places." N.T., 8/29/01, at 134. Indeed, when asked if Father's conduct was appropriate, Mother replied, "No." *Id.* More importantly, however, Mother also acknowledged a myriad of damning conduct that easily overrides any unfortunate, accidental misrepresentation by the trial court. For example, when asked why B.L.W. and J.C.W., Jr. were removed from the home, Mother spontaneously replied, "Because we had sex

in front of the kids." *Id.* at 107. In light of the record as a whole, this misstatement by the trial court is insignificant. Such a misstatement easily can occur, and it is important not to overemphasize it. Indeed, the dissent itself mischaracterizes J.C.W., Jr.'s testimony, claiming that he recanted his original statement that he witnessed sexual activity by his parents in their home. Dissenting Memorandum at 8. In actuality, J.C.W., Jr. stated that he did not **remember** telling the caseworker about witnessing sexual activity, not that he did not make the statement:

Q. You told me you didn't remember telling the Children and Youth caseworker, who is not Miss Rice here, about the incident. Is it that you don't remember or are you telling me that you never told anybody about it?

A. I don't remember telling anybody.

N.T., 8/29/01, at 169–70. At any rate, in light of the fact that Mother herself testified that she "had sex in front of the kids," *id.* at 107, any purported recantation by J.C.W., Jr. is inconsequential.

form the duties." *In re E.M.*, 533 Pa. 115, 120, 620 A.2d 481, 484 (1993) (quoting *In re William L.*, 477 Pa. 322, 345, 383 A.2d 1228, 1239 (1978)). While tragic in our view, such sympathies cannot cloud the consideration of whether parental termination meets the needs and welfare of B.L.W. As the trial court stated:

> The court has personally observed [Mother] in the courtroom and found her to appear lethargic, passive, and with a generally flat affect. Based on the expert testimony of Dr. Rosen, this court's observations, and the totality of the circumstances, we have grave concerns not about [Mother's] willingness to be a mother, but about **her ability to provide the level of protection, security, and stability** that B.L.W. needs and currently enjoys in her present home.

Trial Court Opinion, 4/12/02, at 14 (emphasis added). Thus, the evidence presented was sufficient to satisfy the criteria of 23 Pa.C.S. § 2511(a)(2).

¶ 23 Furthermore, the record is replete with support for the orphans' court's conclusion that the needs and welfare of B.L.W. are being appropriately provided for in her foster home. The child has resided with the same foster family since she and J.C.W., Jr. were adjudicated dependent in June 1998. *Id.* at 37. The family regularly goes swimming and camping, visits relatives who live out of town, and provides B.L.W. with opportunities such as horseback riding lessons. *Id.* at 50–51. Ms. Sally Levy, B.L.W.'s adoption caseworker at Dauphin CYS, testified that B.L.W. is a "bright little girl" who "does extremely well in school" and is anxious to be adopted by her foster family. *Id.* at 49, 52. The foster family has provided a stable environment for B.L.W., and they hope to adopt B.L.W. when she becomes free for adoption. *Id.* at 53. As we have noted, "it is time to give [B.L.W.] a chance to

have [her] fundamental needs met without the constant insecurity that comes with knowing that someday, perhaps in the unreasonably distant future, [she] might again be wrenched away from [her] committed and capable caregivers." *In re N.C.*, 763 A.2d 913, 919 (Pa.Super.2000).

As we said in *In Re B.L.L.*, *supra* at 1013, citing *In Interest of Lilley*, 719 A.2d 327 (Pa.Super.1998), "A parent's basic constitutional right to the custody and rearing of his or her child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy safe environment."

*In re J.A.S.*, *supra* at 782.

¶ 24 Order affirmed.

¶ 25 Judge KLEIN files a Dissenting Opinion.

DISSENTING OPINION BY KLEIN, J.:

¶ 1 I agree with the analysis of the law of the majority. If the record and the findings of fact of the trial judge supported the conclusions made by the trial judge, I would agree with the majority. However, the trial judge misstates the record, that misstatement is adopted by the majority, and therefore I must dissent.

¶ 2 Typical of the critical misstatements are the following:

(1) In its 1925(a) opinion, the trial court states that "[t]he mother's testimony acknowledged that 'father and mother tickled B.L.W. in **inappropriate** regions of her body.'" Trial Court Opinion, at 4. A review of the certified hearing transcript, however, reveals completely *the opposite* testimony from Mother, that she only tickled the child "in appropriate" places:

> Q: Isn't it true that you admit to tickling [B.L.W.], [B.L.W.'s] legs and other

parts of her body **in appropriate ways,** what you described in, I believe, **appropriate places** such as her leg?

A: Her leg, that's all.

Q: **Nothing other than appropriate places?**

A: **No.**

(N.T., 8/29/01 at p. 134).

¶ 3 (2) The majority states on page 386 of its decision that the record does not support the likelihood that appropriate therapy would enable Mother to provide appropriate parental care and that Mother's "incapacity cannot be remedied." This is *not* supported in the record, and such support is necessary because neither the trial court nor this Court is empowered to terminate parental rights under section 2511(a)(2) *unless* CYS shows by clear and convincing evidence that "the causes of the incapacity, abuse, neglect or refusal *cannot or will not be remedied by the parent.*" 42 Pa.C.S. § 2511(a)(2) (emphasis added). The majority cites to one sentence in Dr. Rosen's testimony, that he "would worry about [Mother's] ability to protect herself and others in the home[,]" but neglects to include Dr. Rosen's clarification, that this concern

> was one of the reasons for referring to case management ... it might be difficult to remedy for the individual, but it might be able to be accommodated fairly quickly. For example, if another person was in the home or next door that she sought guidance from it doesn't remedy her problem but it does accommodate it and it would be a way of managing the safety issue.

(N.T., 8/29/01, at pp 99–100). In fact, Dr. Rosen, who was referred by CYS, reached the opposite conclusion of that stated by the trial court and the majority. He stated:

> A: I recommended that she be referred for mental retardation case management

services, because those are people who can help her access other needed services ... I recommended more of a concrete kind of a service which could be done in her home which would involve modeling for her, demonstrating for her, practicing with her how to handle situations that were anticipated to be difficult in her life. *And I thought that that was the best way to see whether or not she had ability to then regain custody and parent her children.* I thought that, again, the case management would be a source of ongoing supervision. I think that people with mild mental retardation need to go to people for advice and particularly under new situations or stressful situations and need guidance... Many of these folks are able to be self-sufficient, hold jobs, maintain a household, but clearly will need help in certain areas, in managing under certain circumstances in particular phases of their life.

Q: [I]s it your testimony that she could be a capable parent just with the right resources?

A: *Potentially she could.* Skills could be remedi[ed] under the right circumstances.

\* \* \* \*

Q: I guess the bottom line is she does have some potential but it would take some serious work?

A: ... Again, her—*of a hundred individuals, she would be the number one person* and it's—*we would be able to tell once somebody actually tried to implement that kind of a strategy whether she could acquire the skills.*

(N.T., 8/29/01, at pp. 87–96).

¶ 4 (3) The majority states that Mother's therapist, Mr. Edwards, indicated that "the therapy never progressed to a phase

where parental roles and boundaries surrounding sexuality could be discussed." Majority Opinion, at 384–85. The majority neglects to point out, however, that Mr. Edwards explained that we "ran out of time with the breakdown with her husband. . . . *she had nothing to do with the breakdown of the sessions . . . .*" (N.T., 8/29/01 at 69–71) (emphasis added). It was Mother who initiated phone contact with Mr. Edwards after she was unable to attend the sessions physically, and Mr. Edwards stated that it was his belief Mother "was still looking for some direction." *Id.* at 72.

¶ 5 (4) The majority states that "Mr. Edwards decided not to enroll Mother in a parenting course to address that concern [parental roles and boundaries surrounding sexuality] *because Mother failed to demonstrate during nine months of treatment that she had any real capacity to address these complex issues.*" Majority Opinion, at p. 385 (citing N.T., 8/29/01, at 72). I find no support in the record for this conclusion. Mr. Edwards took responsibility for not entering Mother in the parenting course covering sexual boundary issues, but for another reason: he wanted her to progress further in the counseling sessions with him and he believed it premature at that point, and he was not given any time frame by CYS as to when the specific areas of therapy needed to be completed. (N.T., 8/29/01 at pp. 70–80).

¶ 6 (5) The majority states in footnote 2 that CYS may "give up on a parent" once the service plan goal has been changed from reunification to adoption, citing *In the Interest of A.L.D.* and *In the Interest of M.B.* However, my review indicates that the court ordered a goal of concurrent reunification to coincide with the goal of adoption. Attached to CYS' brief is a copy of an order dated May 31, 2000 indicating that the plan was " modified (proceed with adoption with concurrent planning); mother is to obtain counseling with special focus on her ability to parent, internalization of the issues relating to her child's sexual victimization and her role in that victimization and, finally, how to insure child's future safety." On May 4, 2001, CYS filed a petition that acknowledges that after a hearing on April 24, 2001, [this date may be an error in CYS' petition—I think it was probably April 24, *2000,* which resulted in the May 31, 2000 order]"the court ordered goal was concurrent planning of reunification to coincide with the recommended goal of adoption." The May 31, 2000 order, which is not included in the certified record on appeal, is not, in my view, a clear change of goal plan from which Mother could appeal. Also, the majority's attempt to find waiver of the claim regarding CYS' efforts is not convincing; CYS' efforts are inextricably tied to Mother's ability to meet the goal of reunification and therefore are crucial to a determination of whether CYS has met its burden to justify termination under section 2511(a)(2). Section 2511(a)(2) states:

(a) **General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \* \* \*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and the cause of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

¶ 7 I agree that if a parent does everything that he or she is told to do but still cannot carry out the duties of being a parent, termination is appropriate and

should take place. *In re J.T.*, 817 A.2d 505 (Pa.Super.2003) (Opinion by Klein, J.) (where record supported conclusion that mother was unable to care for children without continued intensive CYS involvement, termination was proper). Termination under Pennsylvania law can have a harsh result in some cases, and this is one of them. The foster parents have allowed the child to visit with Mother regularly, and Mother has seen the child on a regular basis. However, after adoption, there is no requirement that the foster parents continue to allow the mother to visit. The adoptive parents will have the right to totally cut Mother off from her daughter, whom she has been visiting faithfully whenever given the opportunity. Likewise, the adopting parents have the legal right to cut off all visits with the child's older brother once an adoption takes place.

¶ 8 I do agree with the majority that ultimately it may be concluded that Mother will never be able to adequately care for B.L.W. But ultimately is not now. At this point, we cannot say that mother would not be able to adequately parent child if she had the *appropriate* support from the *appropriate* agency. In this case, I believe CYS essentially abandoned Mother after the psychological report obtained by CYS indicated that Mother needed a different kind of support than that originally anticipated by CYS. While the initially suggested program would not provide the kind of support that Mother would need so that she could potentially be reunited with her daughter, CYS ignored the recommendations for a different modality of treatment. CYS should not be permitted to ignore the psychologist's recommendations for the kind of support and treatment needed by Mother, then complain that she has not progressed enough, and then totally cut off a Mother from her child.

¶ 9 CYS set a goal of reunification. Mother followed through with recommended therapy the best that she could, and ultimately, Dr. Rosen, a psychologist, concluded that she needed practical, in-home counseling rather than traditional therapy in order to improve her parenting abilities. CYS was not able to provide this kind of counseling. Although such counseling is available, most likely through mental health and retardation services, CYS did nothing to assist Mother in making referrals so that she could obtain the counseling she needed. Instead, CYS resorted to termination proceedings. In light of Mother's compromised circumstances, and without CYS support or direction, the goal was unattainable. Simply stated, the record does not support the conclusion that Mother cannot or will not remedy the parenting problems. In fact, the record shows the opposite; Mother has made great efforts to comply with CYS' checklist, and it is CYS that has illustrated an unwillingness or inability to provide the needed services to support Mother in reaching the goal of reunification.

¶ 10 It is true that Mother has limited intelligence. However, we have held that this does not mean that she should be deprived of the opportunity to parent her child. *See In re P.A.B.*, 391 Pa.Super. 79, 570 A.2d 522 (1990); *see also Adoption of J.J.*, 511 Pa. 590, 515 A.2d 883 (1986). Mother should have the chance to pursue appropriate counseling to see if she is able to develop enough parenting skills to have B.L.W. return to live with her. If, after Mother gets the support that the experts say she needs it is determined that she still cannot cope with raising her daughter, *that* is the time for termination. Not now.

¶ 11 This is not an unwilling or uncooperative mother. We do not yet know whether this is or is not a mother who is unable, despite best efforts, to care for her

child. Mother has a relationship with B.L.W. and faithfully visits her. Clearly CYS felt confident enough in Mother's parenting ability in June of 2000, when CYS returned J.C.W. to Mother's care and custody. At the termination hearing, J.C.W. testified that Mother is a good provider for him and that he is very happy at home. At that hearing J.C.W. also recanted his prior story that he witnessed Mother and Father engaging in sexual behavior with another couple. (N.T., 8/29/01, at 168–69.) Mother and J.C.W. moved to Northumberland County to be near family and a support network. J.C.W. is now almost 19 years old. J.C.W. stated that he has a good relationship with his Mother, that she takes good care of his basic needs—cooking for him, doing his laundry, and buying him things. He also testified that when he and B.L.W. lived together in the family residence, he often looked out for her and tried to protect her from any harm. He seems to be the best evidence of Mother's present parenting abilities in a home setting. The majority acknowledges that Mother's home "has been deemed neat, well-kept, and without physical safety issues." Majority Opinion, at 383. (*See* Exhibit 10, Pictures).

¶ 12 Mother made great improvements after her abusive husband left the home. At the termination hearing it became evident that the conditions in Mother's home are now notably different than those present when B.L.W. was originally removed from Mother's care. These changes are largely due to the fact that Father, who allegedly had been sexually abusing B.L.W. and conducting sexual activity with his girlfriend (not Mother) in front of B.L.W., is now separated from Mother and living with his girlfriend. Fortunately, that source of CYS' concerns no longer exits.

¶ 13 In a case such as this, CYS has to prove by clear and convincing evidence that, after appropriate support, Mother will not be able to provide for B.L.W.'s well-being in an environment that will be conducive to her development, emotionally, physically, psychologically, and intellectually. Since she did not get appropriate support, the trial court and majority are only guessing that Mother will not be able to do this. The conclusion flies in the face of the record, which shows Mother has made great strides already and has cooperated as much as possible with all programs CYS set forth for her. It is not Mother's fault that the programs were not suited to her needs. That is the fault of CYS.

¶ 14 Moreover, there has been no finding of what effect termination would have on B.L.W. No one from the agency had determined, as of the date of the termination hearing, what, if any, effect termination would have on B.L.W. *See In re Adoption of A.M.R.*, 559 Pa. 422, 741 A.2d 666 (1999); *In re Adoption of A.C.H.*, 2002 PA Super. 218, 803 A.2d 224 (Pa.Super.) (filed July 2, 2002). This very issue was considered dispositive in a case considered by a panel of this Court, decided on December 9, 2003. *See In re Involuntary Termination of C.W.S.M. and K.A.L.M.-S.*, 2003 PA Super. 477, 839 A.2d 398 (2003).

¶ 15 I also find it telling in this case that B.L.W.'s guardian *ad litem*, who is also an attorney, has not filed a separate brief, but rather has adopted Mother's appellate brief to represent the child's position on appeal. I interpret B.L.W.'s guardian's agreement with Mother's position on appeal as a strong indication that she believes it is in B.L.W.'s best interest not to terminate Mother's parental rights.

¶ 16 The record shows that CYS did not make a reasonable effort to provide appro-

priate services for Mother in order to permit her to reunify with B.L.W. Therefore, I would find that CYS has not yet met its heavy burden to justify termination without giving the Mother additional time to prove herself and help Mother obtain the recommended support. Because I find that the record in this case does not support termination under 2511(a)(2), I would reverse.