**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: C.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.P., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 397 WDA 2025 |

Appeal from the Order Entered March 5, 2025
In the Court of Common Pleas of Allegheny County
Orphans' Court at No: CP-02-AP-0000067-2024

| | | |
|---|---|---|
| IN THE INTEREST OF: S.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.P., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 396 WDA 2025 |

Appeal from the Order Entered March 5, 2025
In the Court of Common Pleas of Allegheny County
Orphans' Court at No: CP-02-AP-0000066-2024

BEFORE: BOWES, J., STABILE, J., and BENDER, P.J.E.

MEMORANDUM BY STABILE, J.:                    **FILED: October 29, 2025**

S.P. (Mother) appeals from the March 5, 2025, decrees involuntarily terminating her parental rights to her biological children S.D. (DOB: 09/2018) and C.D. (DOB: 09/2020).[1]  Upon review, we affirm the termination decrees.

---

[1] Paternity was not established; however, Mother named C.D. as the father of both children.  C.D. died on December 18, 2022, prior to the commencement of the dependency action.  The parental rights of any unknown father were also terminated.

We glean the factual and procedural history of the above-captioned matters from the certified record. Allegheny County Office of Children, Youth and Families ("CYF") had a history of involvement with the family due to drug and alcohol concerns, mental health concerns, hoarding and unsanitary conditions in the home, food insecurity, truancy, intimate partner violence, and medical neglect of the children. *See* Petition for Involuntary Termination, 7/11/24, at ¶ 8.

In September 2022, CYF opened a case for services and made referrals for Mother to complete a POWER[2] assessment, in-home services to assist with improving housing conditions, and intimate partner violence services to mitigate safety concerns. N.T. Hearing 1/27/25, at 25-26. Initially, Mother was referred to POWER for an assessment on October 27, 2022, but failed to complete it. *Id.* at 100.

On December 22, 2022, during an unannounced visit, CYF was concerned that Mother had not completed the assessment and requested an urgent referral to POWER. *Id.* When CYF informed Mother that she would have to provide a drug screen, Mother admitted that she would test positive for marijuana and Gabapentin. *Id.* at 101. Mother said that she was prescribed Gabapentin, but said that she takes more than prescribed because it made her feel "high." *Id.* at 101-02. Within two hours, the assessment was completed. *Id.* POWER recommended Mother attend an intensive

---

[2] POWER stands for Pennsylvania Organization for Women in Early Recovery. It provides services related to drug and alcohol treatment and recovery.

outpatient treatment program, noting that Mother's mental health was a bigger concern, and believed Western Psychiatric Institute and Clinic ("WPIC") would best suit her needs. *See* CYF Exhibits 2 and 3 (3/15/23 adjudication order). Mother did not follow through with the recommendation and indicated that she did not need it. *Id.*

Despite CYF's efforts to prevent court involvement by providing services, the housing conditions did not improve, and Mother did not address the mental health concerns; therefore, CYF filed a petition for dependency of the children.[3] *Id.* S.D. and C.D. were adjudicated dependent on March 15, 2023, and placed in foster care, where they have remained during the pendency of these proceedings. On July 11, 2024, CYF filed a petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a) and (b). The court held a bifurcated termination hearing on January 27, 2025, and February 24, 2025, wherein CYF presented the testimony of: (1) Tarricha Jackson, drug and alcohol coordinator; (2) Deserai Horton, CYF caseworker; (3) Christelle Deffenbaugh, foster care coordinator; (4) Cheyenne Tatters, CYF permanency caseworker; (5) Erin Snyder, CYF supervisor; and (6) Dr. Gregory Lobb, who evaluated the family. CYF also introduced several exhibits, including permanency plans, family service plans and court orders filed on the

---

[3] At the time, petitions were filed on behalf of S.D., C.D., and their older sibling, K.D. K.D. had significant health problems and passed away in November of 2023 while in foster care. Her dependency case was closed.

children's respective dependency dockets, an evaluation of Mother, and Mother's drug screen log. Mother testified on her own behalf.

At the conclusion of the hearing, the court took the matter under advisement and ultimately entered decrees involuntarily terminating Mother's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(2), (5), (8) and (b). This timely appeal followed. Mother raises four issues for our review:

1. Did the trial court abuse its discretion and/or err as a matter of law by involuntarily terminating Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2)?

2. Did the trial court abuse its discretion and/or err as a matter of law by involuntarily terminating Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(5)?

3. Did the trial court abuse its discretion and/or err as a matter of law by involuntarily terminating Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(8)?

4. Did the trial court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of S.D. and C.D. pursuant to 23 Pa.C.S.A. § 2511(b)?

Mother's Brief, at 8.

Our standard of review in this context is well-settled:

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*Interest of M.E.*, 283 A.3d 820, 829-30 (Pa. Super. 2022) (internal citations and quotations omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interest of the child.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (internal citations omitted). "We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence." *In re B.L.W.*, 843 A.2d 380, 383 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004).

Here, the trial court terminated Mother's parental rights pursuant to Section 2511(a)(2), (5), (8), and (b). We need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm. *Id.* at 384. We begin our analysis with Section 2511(a)(2), which states:

> The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control, or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2). "The grounds for termination are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied." *In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021), *appeal denied*, 258 A.3d 1144 (Pa. 2021). We emphasize that "[p]arents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties." *Id.* "A parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties." *B.L.W.*, 843 A.2d at 387-88.

Mother contends that CYF failed to prove by clear and convincing evidence that her conduct warranted termination under Section 2511(a)(2). Specifically, Mother asserts that "CYF failed to provide any competent evidence of any current drug use" or "psychological condition or diagnosis that render Mother incapable of meeting the needs of the children." Mother's Brief, at 25.

> Here, the court found that since S.D. and C.D. were adjudicated,
>
> Mother has been given ample services, time, and opportunities to remedy the issues that led to removal and placement of her children. Over the course of nearly two years of being in care, Mother received in-home services, referral for dual diagnosis treatment, urine screens to demonstrate sobriety, gas cards to assist with transportation, communication via email and text for all of her children's medical appointments, and supervised visitation where the children are brought to see her in community locations like the mall or library. . . . Mother either cannot or will not remedy the conditions that continue to linger into present day, nearly two years later.

Juvenile Court Opinion, 4/22/25, at 25.

Mother's permanency plan objectives essentially remained the same throughout the life of the case. Initially, Mother's objectives were to: (1) enroll in the intensive outpatient program recommended by POWER; (2) cooperate with in-home services to address the condition of the home; (3) attend all medical appointments for the children; (4) attend supervised visits with the children; and (5) complete random urine screens. N.T., 1/27/25, at 33; *see also* CYF Exhibits 2 and 3 (3/15/23 adjudication order).

The record demonstrates that Mother was minimally to moderately compliant with her permanency plan objections and made minimal to moderate progress toward alleviating the circumstances that brought S.D. and C.D. into care.

The children were removed, in part, due to allegations of medical neglect. Mother's objective was to attend the children's medical appointments. After the children were adjudicated dependent, CYF discovered that the needs of the children were much greater than they anticipated. *See* CYF Exhibits 2 and 3 (6/7/23 permanency review order). S.D. and C.D. were both diagnosed with slow weight gain. *Id.* (9/6/23 permanency review order). S.D. had several cavities and a urinary tract infection that was untreated for a year. *Id.* (6/7/23 permanency review order). A blood test also revealed that S.D. had Pyelonephritis (enlarged kidneys) and she was diagnosed with re-feeding syndrome and Epstein-Barr. *Id.* S.D. spent three days in the hospital, and Mother did not visit. *Id.* Both children now attend trauma therapy and are doing better with consistent medical treatment and follow-up. N.T., 1/27/25, at 52, 85.

Of the 15 medical appointments identified at the termination hearing by CYF caseworker Ms. Horton, Mother only attended five of them. *Id.* at 47-48. Mother was informed of the appointments via text and acknowledged that she received the information. *Id.* Most of the time, Mother was unable to attend because she was working. *Id.* at 49. Her work schedule was Sunday through

Wednesday, 2:00 p.m. to 10:30 p.m. N.T., 2/24/25, at 88. Because the children's appointments were scheduled through CYF, Mother said it was difficult to attend since they were scheduled during her work hours. *Id.* After raising this concern with CYF, Mother was able to attend more appointments as they were scheduled outside of her work schedule. *Id.* at 99-100. Mother did not provide a timeframe for when this change occurred, or how many appointments she attended after the change was made.

Another objective was for Mother to complete a dual diagnosis treatment program through WPIC to address substance use and mental health concerns. At the time of the termination hearing, Mother had not completed the goal. N.T., 1/27/25, at 35. Mother began treatment in August or September 2023, but was discharged only a few months later at the end of 2023 due to unsuccessful completion of the program.[4] *Id.* at 36, 39; *see also* CYF Exhibits 2 and 3 (9/6/23 permanency review order). She re-engaged with WPIC on March 6, 2024, and was actively participating in a dual program at the time of the hearing. *Id.* at 36. However, the program was virtual, and Mother was scheduled to attend once a month for one hour. *Id.* at 40. CYF noted that Mother's participation was inconsistent as WPIC reported that she attended less than monthly. *Id.* at 61-62.

---

[4] The January 10, 2024, permanency review order notes that Mother did not attend any appointments at WPIC since the previous hearing on September 6, 2023. *See* CYF Exhibits 2 and 3 (1/10/24 permanency review order).

CYF's concerns with Mother's mental health were not alleviated by the time of the termination hearing. *Id.* at 41. Dr. Gregory Lobb performed an evaluation of the family and issued his report on December 6, 2024. N.T., 2/24/25, at 5. As part of his evaluation, Dr. Lobb administered two psychological assessments of Mother – the Minnesota Multiphasic Personality Inventory-3 ("MMPI-3") and the Symptom Checklist 90-R ("SCL-90-R"). *Id.* at 17-18. However, both assessments were invalidated due to Mother underreporting her symptoms. *Id.* at 19-22. Because Mother minimized her problems and denied even minor faults and shortcomings, it was difficult for Dr. Lobb to ascertain whether Mother was experiencing emotional or psychological problems. *See* CYF Exhibit 5 at 8-9. Dr. Lobb also noted he was concerned that Mother minimized her stress as she recently experienced a lot of grief due to the removal of her children, and the loss of her husband (the children's father), her father (maternal grandfather), and K.D., her daughter and children's older sibling. *See id.* at 8. As a result, Dr. Lobb recommended that Mother increase her therapy sessions to once a week. N.T., 2/24/25, at 36-37.

In addition to the treatment program, Mother was also required to complete urine screens. Since February 22, 2023, CYF requested a urine screen from Mother 39 times. N.T., 1/27/25, at 10. She attended 15, six of which were positive – July 28, 2023, positive for cocaine; September 29, 2023, positive for marijuana; February 29, 2024, positive for marijuana; May

15, 2024, positive for marijuana; June 13, 2024, positive for marijuana; and November 15, 2024, positive for opiates[5]. *Id.* at 10-11. Mother testified that she last used marijuana in September 2024, shortly before her medical marijuana card expired. N.T., 2/24/25, at 84-85. She also denied using Gabapentin, but admitted she still had a full prescription left. *Id.* at 85.

A major objective for Mother was to improve the condition of her home. N.T., 1/27/25, at 41. CYF provided in-home services to Mother prior to filing the dependency action to avoid court involvement. *Id.* at 25. Unfortunately, even working with in-home services, the condition of the home did not improve and CYF ultimately filed dependency petitions. *Id.* at 29. For example, prior to the dependency action, an in-home service provider completely cleaned Mother's kitchen. *See* CYF Exhibits 2 and 3 (3/15/23 adjudication order). By the time the caseworker went into the home next, garbage was piled high and there were flies everywhere. *Id.*

At the adjudication hearing, Mother acknowledged that the home needed improvement and that she needed to get rid of more stuff. *Id.* Mother was also facing eviction as she owed $6,000 in back rent. *Id.* CYF offered to pay the landlord to avoid eviction; however, the landlord was hesitant because

---

[5] At the time of the screen, Mother acknowledged that she would be positive for oxycodone as she was recently prescribed for a shoulder injury. N.T., 2/24/25, at 119. Ms. Jackson, the drug and alcohol coordinator, testified that oxycodone is a separate class of drugs from opiates. N.T., 1/27/25, at 11. The lab confirmed Mother was positive for opiates and negative for oxycodone. *Id.* at 12-13; *see also* CYF Exhibit 1.

- 11 -

they had received ongoing complaints about drug use on the balcony and Father's overdose in the home. *Id.* In May 2023, Mother stated her intention to move into her father's home that she inherited after his death; however, there were issues that needed to be addressed before the home could be assessed. *Id.* (6/7/23 permanency review order). As of September 2023, Mother was engaged with in-home services and utilized a dumpster provided by CYF to clear the garbage and clutter in her home. *Id.* (9/6/23 permanency review order).

CYF assessed Mother's new home in March 2024 and described the condition of the home:

> There [were] piles of wood, like a flat piece of wood for flooring up against the wall. Boxes piled up, the cat box in the walkway, in the middle of the walkway.
>
> The hallway [that went] up to the third floor, there [were] a large amount of items, a mattress, cat litter, cat food, boxes, other belongings to the house, a highchair that was closing up the walkway to go to the hallway.
>
> The living room had a couch with a cage off to the side, [which] covered a small walkway. The other half of the living room had bags filled with things that [were] closing off the walkway into the kitchen.
>
> There is, on the other side of the living room, laundry baskets filled with things. Other items stacked on top of each other.
>
> To walk in the kitchen, I had to step over bags and other objects in the walkway.
>
> The first room, when you entered the house, was filled with boxes almost to the top of the ceiling. There was a mattress in there. There was no room to walk through this bedroom that Mother had identified for [S.D.]

- 12 -

> And again, the walkway to the kitchen, there was a table preventing me to walk straight to the kitchen.

N.T., 1/27/25 at 74-75. That was the last time CYF was able to assess Mother's home. *Id.* at 46. CYF attempted to assess the home on June 14, June 25, July 12, August 20, August 29, 2024, and January 23, 2025. *Id.* at 45. Mother reported several times that the house was not ready to be assessed or for the children to return to the home. *Id.* at 46. She was engaged with in-home services in 2023, but no longer wanted to work with them in the beginning of 2024 because, according to Mother, they were not helpful. *Id.* at 42. At the end of 2024, Mother did reengage with in-home services, but only met with the provider a few times. *Id.* at 41.

As of the hearing on January 27, 2025, Mother reported that the furnace in her home was broken and the pipes burst.[6] *Id.* at 42. She was unsure when they would be fixed and, therefore, was residing with a friend, Joe Clark. *Id.* at 42. Shortly after the hearing, Mother provided CYF with Mr. Clark's

---

[6] As of February 2025, Mother testified that she was not going to continue the repair work on her home until the weather warmed up. N.T., 2/24/25, at 92. In addition to the furnace being broken, Mother explained that a dog, which she was trying to rehome because of its aggressive behavior, was still living in the home with no heat or water. *Id.* at 130-31. Mother explained that she went to the home once or twice a day to let the dog out. *Id.* at 130. When she is not there, however, the dog chews things, such as tearing apart several garbage bags that were in the home. *Id.*

information.[7]  N.T., 2/24/25, at 63.  She also informed CYF that there were two major repairs to be completed before a home assessment could occur – the children's bathroom and a banister on the stairs.  *Id.* at 65.  Ms. Horton scheduled a home assessment for February 6, 2025.  *Id.*  Unfortunately, she had unexpected bereavement leave and rescheduled the assessment for February 21, 2025.  *Id.* at 63, 65. The assessment did not occur because Mother indicated that the bathroom repairs were not finished, and she did not want the home assessed until they were done.[8]  *Id.* at 66, 68-69.  Thus, as of February 2025, CYF had not assessed Mother's residence, whether it be her home or Mr. Clark's home.

Although Mother was consistent with her visitation with the children, the visits never progressed beyond supervised because she was not compliant with her other objectives.  N.T., 1/27/25, at 50, 77.  While the visits generally went well, it was reported that the children's behaviors regressed and there were incidents of bedwetting.  *See* CYF Exhibits 2 and 3 (9/6/23 permanency review order).  In February 2024, the children had an overnight visit with

---

[7] CYF indicated that before any visits occurred in the home, Mr. Clark would have to undergo a background check.  N.T., 2/24/25, at 64.  He did not provide CYF permission to conduct the background check until February 24, 2025, the second day of the termination hearing.  *Id.*  A quick check revealed that Mr. Clark had a criminal history.  *Id.*

[8] Mother testified that the water to the bathroom was shut off because she was in the process of replacing the shower, and the drainpipe for the sink was disconnected.  N.T., 2/24/25, at 90.

Maternal Grandmother. *Id.* (5/15/24 permanency review order). After the visit, the children reported to the foster parents that Mother and Alex, her then-roommate, were also present without CYF's knowledge. *Id.* The children stated that Alex was drinking during the visit and slept next to S.D. in the bed. *Id.* Mother and Maternal Grandmother denied the allegations. *Id.*

Accordingly, the record demonstrates that Mother's repeated and continued incapacity to comply with her permanency objectives due to her refusal to improve the condition of her home, to compete a dual diagnosis program, and attend the children's medical appointments has caused S.D. and C.D. to be without essential parental care, control or subsistence necessary for their physical and mental well-beings. Mother's ability to comply with her objectives coincided with obtaining appropriate housing and attending the children's medical appointments, and her refusal to do so impedes her ability to provide appropriate parental care. Thus, the conditions and cause of Mother's incapacity cannot or will not be remedied. Therefore, the court did not abuse its discretion in terminating Mother's parental rights pursuant to Section 2511(a)(2).

We now turn to Section 2511(b), which states, in pertinent part:

The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S.A. § 2511(b). "Notably, courts should consider the matter from the child's perspective, placing her developmental, physical, and emotional needs and welfare above concerns for the parent." *Interest of K.T.*, 296 A.3d 1085, 1105 (Pa. 2023). This determination "should not be applied mechanically," but "must be made on a case-by-case basis," wherein "the court must determine each child's specific needs." *Id.* at 1106.

Our Supreme Court has mandated that a Section 2511(b) analysis must include "consideration of the emotional bonds between the parent and child." *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). Thus, the court must determine whether the adverse impact of severing the parent-child bond "is outweighed by the benefit of moving the child toward a permanent home." *Id.* at 253.

> [B]y evaluating the impact of severance to determine if it will impose more than an adverse or detrimental impact, courts correctly refine their focus on the child's development and mental and emotional health rather than considering only the child's "feelings" or "affection" for the parent, which even badly abused and neglected children will retain.

*K.T.*, 296 A.3d at 1110.

However, "courts must not only consider the child's bond with the biological parent, but also examine the intangibles such as the love, comfort, security, and stability the child might have with the **foster** parent." *K.T.*, 296 A.3d at 1111 (emphasis in the original; internal citations and quotation marks omitted). Thus, courts should also consider factors that naturally arise due to the particular facts of a case, such as: (1) the child's need for permanency and time in foster care; (2) whether the child is in a pre-adoptive home and

bonded with foster parents; and (3) whether the foster home meets the child's needs. *Id.* at 1113.

Here, Dr. Lobb was asked to provide an opinion on (1) the bond between the children and Mother; (2) the bond between the children and the foster parents; (3) whether Mother was able to care for the children; and (4) whether termination was in the best interests of the children. *See* CYF Exhibit 5 at 3. Dr. Lobb noted that both S.D. and C.D have a secure attachment bond with Mother and foster parents. *Id.* at 24-25. However, the children view foster parents as their psychological parents. *Id.* at 26. Dr. Lobb noted that foster parents were the children's "go-to adults in their lives[,]" and "have been the consistent adults" as they meet the children's day-to-day needs. *Id.*

While Dr. Lobb was unable to diagnose Mother with any mental health condition because of her invalidated test scores, Dr. Lobb was concerned that Mother took limited responsibility for the issues raised by CYF and the reasons for the removal of the children. *Id.* Combined with the fact that CYF has been unable to assess Mother's residence, whether it was her own or a friend's, Dr. Lobb was concerned that Mother was unable to care for the children. *Id.* Moreover, Mother was inconsistent with attending the children's medical appointments, her urine screens and her treatment program. *Id.* at 26-27.

As a result, Dr. Lobb opined that termination was in the children's best interest because it moved toward permanency:

- 17 -

The children's needs are being met with the foster parents currently. It does not appear that significant progress has been made for [Mother] to be able to care for [S.D.] and [C.D.] on her own at this time. [Mother] continues to only have supervised visits, her house has not been assesse[d] as being clean and appropriate, she is not consistently attending the children's medical appointments[,] and she has not been consistently attending drug screens. At this time, termination of parental rights would best meet the needs and welfare of [S.D.] and [C.D.]

*Id.* at 27. Dr. Lobb's testimony during the termination hearing was consistent with his report. He testified that any progress Mother made was slow and that the children had been in a foster home for a year and viewed their foster parents as psychological parents. N.T., 2/24/25, at 36-38. Therefore, he opined that the need for permanency via termination of parental rights was in the children's best interest. *Id.* at 38.

The court agreed with Dr. Lobb that termination was in the children's best interest:

[T]his court does not doubt that Mother loves her children. However, this court is faced with overwhelming, incontrovertible evidence that termination and adoption is in the best interest of these children, that [the children] have a need for permanency, that Mother may be [a] beneficial bond but was no longer a necessary bond, and that any potential harm from termination and adoption will be mitigated by the fact that these children are in therapy in a safe, secure, and stable preadoptive home with adults they view as their psychological parents.

. . . Unfortunately for Mother, her slow pace of progress allowed her children, over the last fifteen months, to grow roots and establish an evident attachment and bond with their foster parents. They are now in a place where they receive consistent medical care and follow-up, regular therapy, pro-social activities, school stability, and the overall safety and security that Mother cannot provide.

- 18 -

Juvenile Court Opinion, 4/22/25, at 28-29.

Based on the foregoing, we find no abuse of discretion or error of law in the court's ruling that termination was warranted pursuant to Section 2511(b). Accordingly, we affirm the decrees terminating Mother's parental rights.

Decrees affirmed.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

DATE: <u>10/29/2025</u>