J-A11008-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: B.Y.A. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: M.K, MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 102 WDA 2021 |

Appeal from the Order Entered December 28, 2020
In the Court of Common Pleas of Westmoreland County Orphans' Court
at No(s):  No 12 of 2020

BEFORE:  McLAUGHLIN, J., KING, J., and McCAFFERY, J.

MEMORANDUM BY McLAUGHLIN, J.:          **FILED: AUGUST 9, 2021**

M.K. ("Mother") appeals from the order terminating her parental rights to B.Y.A. ("Child"). She argues the court erred in failing to appoint counsel to represent Child's legal interest, admitting and considering certain evidence at the termination hearing, and concluding that clear and convincing evidence supported termination. We affirm.

The Westmoreland County Children's Bureau ("Agency") filed a Petition for Involuntary Termination of Mother's Parental Rights on March 2, 2020, and the court held an evidentiary hearing on October 1, 2020. Prior to the hearing, the court appointed an attorney to serve as Child's guardian *ad litem* ("GAL"). At the beginning of the hearing, the Agency brought to the court's attention that the GAL would also be serving as Child's legal counsel. The GAL advised the court that there was no conflict between Child's best interest and legal interest: "Based upon [Child's] age and my involvement in this case since the

onset, I don't think there is any conflict or any reason I couldn't serve in both capacities to the extent that it is needed." N.T., 10/1/20, at 6. Mother objected on the basis that she "was not aware that [the GAL] was going to serve in the capacity as child's attorney. . . ." **Id.** The court overruled the objection.

At the hearing, the Agency introduced the testimony of the following witnesses: Agency caseworker Danae Hudock, who testified regarding the extent of Mother's compliance with the Family Service Plan; Ashley Beck, a trauma therapist, who completed a mental health assessment of Mother; Margaret Ferguson, an expert witness, who supervised therapeutic visits between Mother and Child; Dr. Neil Rosenblum, an expert witness, who evaluated Child's interactions with Mother and with the foster parents, as well as Mother's mental health; Agency case manager Jason Ware, who testified regarding Child's early failure to thrive diagnosis and medical needs; and Erin Hyland, a volunteer child advocate.

The testimony reflected that Child was born in April 2018, and placed with foster parents in November 2018, due to a diagnosis of failure to thrive. Despite Child's multiple medical issues, Mother failed to take Child to several doctors' visits during the six months before Child's removal, between April and October 2018. Mother began feeding Child watered-down 2% cow's milk instead of formula, leading to malnourishment and a drop in weight from 85th percentile to less than the first percentile within the first seven months of Child's life. Despite the severity of the problem, it took four and a half hours to convince Mother to admit Child to the hospital. Child was in the hospital for

seven days and underwent intensive re-feeding, and the Agency filed a form indicating Mother and Father as perpetrators of abuse due to physical neglect. The court adjudicated Child dependent on November 28, 2018, and tasked Mother with participating in random drug screens, undergoing a mental health and psychiatric evaluation, submitting to any recommended treatment, completing a parenting course, and obtaining stable and appropriate housing.

At permanency review hearings, the court found Mother's compliance with these goals to be moderate and her progress to be minimal. Mother was discharged from drug screening after a series of successful screens and has not obtained stable and appropriate housing. She participated in regular visits with Child until August 2019, when Mother relocated to New York. Mother returned in March 2020, after the Agency filed the termination petition, and had four additional visits until pandemic restrictions were imposed. Mother had inconsistent visits in May and July 2020. Child showed some separation anxiety when leaving her foster parents to visit with Mother, and eagerly transitioned away from Mother and back to foster family following the visits. Mother did not consistently provide healthy meals for Child during visitation.

Ashley Beck, a trauma therapist, testified at the termination hearing that she performed mental health evaluations of Mother between April and June of 2019. Beck she said the evaluations consisted of her obtaining "historical psycho or psychosocial" and background information from Mother. Mother also completed a drug and alcohol questionnaire and a personality assessment inventory test. *Id.* at 10. Beck said she has a master's degree in

social work and has training in cognitive behavioral therapy and mental health evaluations, which she had done approximately 20 times in the preceding year and a half. *Id.* She also stated that her social work license entitles her to give "preliminary" diagnoses. *Id.* at 12. The Agency offered her as an expert in "the evaluation she performed[,] her observations, and her results." *Id.* Mother objected that Beck was not qualified to make any mental health diagnosis. The court stated, "I don't know whether or not she is going to give an opinion as to any specific diagnosis, but I will obviously give the proper weight to that." *Id.* at 13.

Beck then testified that Mother disclosed historical diagnoses of bipolar disorder and schizophrenia as a child but discontinued her mental health treatment while still a teenager. *Id.* at 14. The evaluations revealed "concern for a pattern of manic episodes and impulse control" and "with [Mother's] attention seeking behaviors and her strong need for attention or control of other individuals." *Id.* at 15. They also showed her to be "prone to be more reactive with anger outbursts and that people are often intimidated by her." *Id.* Mother admitted to Beck that she had stopped feeding Child formula but denied providing insufficient care or that there had been a problem with Child's weight. *Id.* at 16, 20. Beck also reported that Mother was "not open" to medication. *Id.* at 20. Based on her evaluation, Beck recommended weekly individual therapy, medication, and evaluation by a psychiatrist. *Id.* at 15, 20. Although Mother began mental health treatment in New York, she was given an unsuccessful discharge from the program in February 2020 when she

returned to Pennsylvania. *Id.* at 22. Beck did not make any diagnosis of Mother.

Dr. Rosenblum testified as an expert witness about his evaluations of Mother's and foster parents' interactions with Child. He also evaluated Mother individually. When the Agency offered him as an expert, Mother's counsel stated that she did not have an objection and the court accepted him as an expert. *Id.* at 29. Dr. Rosenblum then testified that he not only had made own observations, but also had reviewed Beck's report, Ferguson's summaries of Mother's supervised visits, and the permanency orders in the dependency case.

According to Dr. Rosenblum, Child was thriving in the care of her foster parents, with whom she "enjoys a very strong primary attachment" and who had put an "impressive" amount of effort into the relationship. *Id.* at 30-31; *see also id.* at 32-34, 46-47. Dr. Rosenblum observed that Mother was "very appropriate" during her evaluation with Child and had "the ability to provide [Child] with a very positive stimulation." *Id.* at 35. However, Dr. Rosenblum "did not observe a great deal of affection between the two." *Id.* at 36. He found that Child's relationship with Mother "is certainly more peripheral and secondary for [Child], but it was a cordial relationship and the interaction was reasonably comfortable in nature." *Id.*

Dr. Rosenblum testified that Mother acknowledged a history of mental health treatment since childhood, but "tends to downplay her needs for mental health treatment" and "has not persevered with mental health treatment." *Id.*

at 37. He stated she "had been diagnosed as an adult with bipolar disorder." *Id.* He testified that Mother "display[s] at times certain characteristics of mania," and diagnosed Mother with "Unspecified Bipolar Disorder and an Adjustment Disorder with mixed disturbances of emotions and conduct. A pattern of Antisocial Personality Traits. History of Relationship Distress with spouse or intimate partner and Parent/Child Relational Problem." *Id.* at 37, 44. He stated these diagnoses make the prognosis for Mother pursuing mental health treatment "very guarded." *Id.* at 45.

Dr. Rosenblum opined that due to Child's primary attachment with her foster parents, removing her from their care would cause emotional distress. *Id.* at 47-48. He also said that if Mother's parental rights were terminated, it would not be detrimental to Child, as Child's relationship with Mother is not "a necessary and beneficial relationship that would need to continue." *Id.* at 51-52. Dr. Rosenblum testified that there may be benefits for Child to having ongoing contact with Mother, including "the ability to know who her birth mother is, to understand some aspect of her family roots, [and] to be able to potentially have some contact not only with her birth mother but with her sister." However, he considered that to be "something that can be explored over[]time." *Id.* at 51; *see also id.* at 67.

When the Agency offered Dr. Rosenblum's written report into evidence, Mother's counsel objected, "I think the best evidence is his testimony and there are other things in here that he hasn't testified to, so I object to the report itself." *Id.* at 53. The court overruled the objection.

On cross-examination, Dr. Rosenblum testified that he had not received Mother's mental health records from New York, and therefore had not considered them in his evaluation or report. When he began to testify that he knew of Mother's previous mental health diagnoses from Beck's report, Mother objected by stating that "the bipolar disorder was not allowed to be admitted from [Beck's testimony]. So that is not in the record." *Id.* at 58. The court responded, "If he relied on their reports, then he's allowed to testify to that. I mean, if that is what he normally does in his profession, then it is allowed so I am going to overrule it." *Id.* Dr. Rosenblum then testified that Beck's report listed a history of schizophrenia and a "bipolar disorder to rule out," but reiterated that Mother had also disclosed both diagnoses to him. *Id.* at 59. Dr. Rosenblum stated Mother "didn't necessary agree with those diagnos[e]s and I was not trying to stereotype her or overly rely on previous diagnoses." *Id.*

Mother asked Dr. Rosenblum whether he had done a "cultural evaluation." *Id.* at 62. Dr. Rosenblum responded, "No. I am aware of her culture, but as she indicated to me that she disagreed with some of the parenting assessments that were culturally bias [sic] by [Ferguson], that's mentioned in there, treatment summary, but I didn't see any major cultural problems with [M]other." *Id.*

Following the hearing, the court entered an order terminating Mother's parental rights to Child pursuant to 23 Pa.C.S.A. §§ 2511(a)(2), (a)(8), and (b). Order, 12/28/20, at ¶ 2. The court found that Child had been in placement

since November 2018 and that the conditions that led to the placement continued to exist. *Id.* at ¶ 3. The court also determined that Mother had "not made sufficient progress toward addressing the issues that caused [Child] to be without proper parental care, control or subsistence necessary for her physical or mental well-being." *Id.* It concluded that Mother had "not addressed several parenting deficiencies, including a proper understanding of [Child]'s diagnosis of failure to thrive." *Id.* The court also concluded that Child's "best interest and well-being would be served by terminating the rights of [Mother] and permit[ting Child] to be adopted." *Id.* at ¶ 4.[1]

Mother appealed. She raises the following issues:

1. Did the Trial Court commit an error of law by allowing the Guardian ad Litem (hereinafter "GAL") to serve as counsel [for] child and GAL in the termination trial?

2. Did the Trial Court commit errors of law or abuse its discretion in admitting, and/or considering, diagnoses of a mental health disorder of Mother in arriving at its findings and conclusions to involuntarily termination [Mother]'s parental rights?

3. Did the Trial Court commit errors of law or abuse its discretion in admitting, and/or considering, written evidence that was not included in witnesses' testimony in arriving at its findings and conclusions to involuntarily terminate [Mother's] parental rights?

4. Did the Trial Court commit errors of law or abuse its discretion in admitting, and/or considering, opinion evidence of Dr. Rosenblum in arriving at its findings and conclusions to involuntarily terminate [Mother's] parental rights?

5. Did the Trial Court commit errors of law or abuse its discretion in finding that Westmoreland CYS met its burden by clear and

_____

[1] The court relied on its order to satisfy Pa.R.A.P. 1925(a).

- 8 -

convincing evidence that termination of parental rights of Mother was warranted pursuant to 23 Pa.C.S. § 2511(a)(2) and 23 Pa.C.S. § 2511(a)(8)?

6. Did the Trial Court commit errors of law or abuse its discretion in finding that Westmoreland CYS met its burden by clear and convincing evidence pursuant to 23 Pa.C.S. § 2511(b) that the best interest of the child would be met by terminating the Mother's parental rights?

Mother's Br. at 4 (suggested answers omitted).

We review an order terminating parental rights for error of law or abuse of discretion. *In re Adoption of K.C.*, 199 A.3d 470, 473 (Pa.Super. 2018). We must "accept the findings of fact and credibility determinations of the trial court if the record supports them." *Id.* We review the court's legal conclusions *de novo*. *In re T.S.*, 192 A.3d 1080, 1087 (Pa. 2018).

## 1. Child's Right to Counsel

Mother first argues that the trial court erred in failing to appoint legal counsel for Child. Mother contends that although Child was only two years old at the time of the termination hearing, Child was comfortable with her Mother's sister and "enjoyed being in Mother's custody." Mother's Br. at 15. Mother then infers that Child "apparently" wanted to reunite with Mother such that the GAL's position in favor of termination conflicted with Child's legal interest. Mother thus argues the court erred in failing to appoint legal counsel.

Despite Mother's failure to raise this precise issue below – her only objection at the hearing to the GAL's acting as Child's sole counsel was lack of notice – this issue is properly before us. A claim that the court improperly

failed to appoint legal counsel is not waivable. ***In re T.S.***, 192 A.3d at 1087. We will therefore address her issue on the merits.

Section 2313(a) of the Adoption Act[2] requires the Court of Common Pleas to "'appoint an attorney to represent the child's legal interest, *i.e.* the child's preferred outcome,' and the failure to appoint counsel constitutes structural error in the termination proceedings." ***In re Adoption of K.M.G.***, 240 A.3d 1218, 1223-24 (Pa. 2020) (quoting ***In re T.S.***, 192 A.3d 1080, 1082 (Pa. 2018)). However, where "the preferred outcome of a child is incapable of ascertainment because the child is very young and pre-verbal, there can be no conflict between the child's legal interests and his or her best interests." ***In re T.S.***, 192 A.3d at 1092. In such a case, a court entertaining a termination petition may allow an attorney serving as the child's GAL, and thus representing the child's best interest, to be the child's only attorney during the proceeding. ***Id.*** at 1092-93.

Here, Mother concedes that because Child was two years old at the time of the hearing, she could not "directly communicate her wishes." Mother's Br. at 15. That being the case, there could be no conflict between Child's legal interest and her best interest. There consequently was no error in not appointing separate legal counsel. ***In re T.S.***, 192 A.3d at 1092-93.

Mother attempts to generate a conflict by faulting the GAL for only advancing Child's best interest and not presenting "positive evidence of

---

[2] 23 Pa.C.S. § 2313(a).

Mother's behavior with Child. . . ." Mother's Br. at 15. We perceive no conflict. Evidence that, in Mother's words, Child was "comfortable" with Mother and Mother's sister and "enjoyed being in Mother's custody" is not enough to determine Child's actual preference. Mother's Br. at 15. Even assuming that a child so young could formulate a preference, such evidence at best shows Child's transient emotional state while with Mother. The court did not err in allowing the GAL to be Child's sole representation at the termination hearing.

## 2. Beck's Testimony about Mother's Mental Health

Mother next argues the court erred or abused its discretion in admitting and considering Beck's testimony. Mother argues Beck lacked specialized knowledge beyond that of the average layperson and therefore was not qualified to evaluate Mother's mental health. She contends that for this reason her opinion testimony and report were inadmissible under Pa.R.E. 702(a).

Mother waived her challenge to Beck's qualifications to conduct mental health evaluations by not making any such objection below. At the termination hearing, she objected that Beck was not qualified to make mental health diagnoses. She now argues she lacked qualifications to perform mental health evaluations. The two are not the same. Mother's present issue is waived. *See* Pa.R.A.P. 302(a). In any event, Beck never offered any testimony that she had diagnosed Mother.

## 3. Dr. Rosenblum's Report

Mother argues the court erred or abused its discretion in admitting and considering Dr. Rosenblum's written report. She contends it improperly relied

on Beck's alleged diagnosis of Mother as bipolar and contained "facts and information" not included in Dr. Rosenblum's trial testimony. Mother's Br. at 17. Mother argues the court should only have admitted Dr. Rosenblum's oral testimony.

Insofar as Mother complains the report contains "facts and information" not covered by Dr. Rosenblum's testimony, Mother has waived the argument by failing to identify in her brief any purportedly inadmissible facts or information. Indeed, even at the hearing Mother failed to specify the part of the report she contended was not covered by Dr. Rosenblum's testimony. ***See*** N.T. at 53. Furthermore, her brief cites no authority for the proposition that aspects of the report not covered in Dr. Rosenblum's testimony were inadmissible. Her argument is simply too undeveloped to be considered on appeal. ***See Norman for Estate of Shearlds v. Temple Univ. Health Sys.***, 208 A.3d 1115, 1119 (Pa.Super. 2019) (holding claims waived "because they are undeveloped and lack citation to pertinent legal authority"). To the extent Mother complains the report was inadmissible for stating that Beck had diagnosed Mother with bipolar disorder, Mother has waived that argument by failing to raise the objection in the trial court. ***See*** Pa.R.A.P. 302(a). Moreover, as above, Beck did not testify to any diagnosis she personally rendered for Mother.

Furthermore, Mother's objection to Dr. Rosenblum's report is factually inaccurate. The report does not state that Beck diagnosed Mother with bipolar disorder or that Dr. Rosenblum relied on her assessment, or even discuss

- 12 -

Beck's assessment at all. It only lists Beck's reports as one of the "Sources of Collateral Information." ***See*** Agency's Exhibit A2, at 1-10 (unpaginated). This issue fails.

### 4. Dr. Rosenblum's Testimony

Mother next turns to Dr. Rosenblum's testimony, arguing that the court should not have "admit[ed] and/or consider[ed]" his expert opinion evidence. Mother's Br. at 4. Mother claims his opinions were inadmissible because he improperly relied on Beck's opinion, never received Mother's prior mental health records, and did not perform a cultural evaluation. Mother asserts Dr. Rosenblum relied only on the records provided by the Agency and was a paid witness of the Agency. According to Mother, his opinions were therefore "questionable, biased, and prejudiced." Mother's Br. at 19.

Mother has waived any challenge to Dr. Rosenblum's opinion evidence by failing to make any timely objection below. When the Agency offered him as an expert during the hearing, Mother's counsel affirmatively stated that she had no objection and at no other time did she attempt to argue that he could not offer expert opinions. Her only objection to his testimony came during cross-examination, when opposing counsel asked Dr. Rosenblum what he knew about Mother's previous mental health diagnoses. At that point, Mother objected to the scope of Dr. Rosenblum's testimony, stating he should not be permitted to testify that Beck had diagnosed Mother with bipolar disorder. N.T. at 58.

The trial court overruled the objection, but Mother does not now challenge that ruling. Instead, she attempts to combine Dr. Rosenblum's alleged reliance on Beck with other purported failings – alleged failure to obtain records, failure to perform a cultural analysis – to claim his opinions were inadmissible in their entirety. Because she never challenged his ability to offer expert opinions below, she cannot make such an argument on appeal. Moreover, her insistence that his opinions were "questionable, biased, and prejudiced" go to credibility and weight, not admissibility.

### 5. 23 Pa.C.S.A. §§ 2511(a)(2) and (a)(8)

Mother contends the court erred or abused its discretion in finding the agency presented clear and convincing evidence that termination was warranted under 23 Pa.C.S.A. §§ 2511(a)(2) or (a)(8). Mother argues she did not willfully refuse to rectify the conditions that led to Child's removal. Rather, she contends that she took reasonable steps to fix those problems and would have continued to do so, but for the pandemic. She claims she had to relocate to Brooklyn, New York, for familial and financial support and that she "made her best efforts to engage in court-ordered services" while in New York. Mother's Br. at 20. Mother claims she completed a parenting class, applied for health insurance, and attended weekly mental health treatment. Mother also returned to Pennsylvania in February 2020 to resume visits with Child until the visits were suspended due to the Covid-19 pandemic.

"A party seeking termination of parental rights bears the burden of establishing grounds for termination 'by clear and convincing evidence.'" ***In***

*re Adoption of K.C.*, 199 A.3d at 473 (quoting *In re Z.S.W.*, 946 A.2d 726, 728 (Pa.Super. 2008)). "Clear and convincing evidence is evidence 'that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue.'" *Id.* (quoting *In re Z.S.W.*, 946 A.2d at 728-29).

Grounds for termination are governed by 23 Pa.C.S.A. § 2511, which entails a two-part analysis. First, the court must find termination warranted under any subsection of Section 2511(a). These subsections focus on the fitness of the parent. *In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007). We need only agree with the court's decision as to any one subsection in order to affirm the termination of parental rights. *In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004).

We agree with the trial court that the Agency presented clear and convincing evidence that termination was warranted under Subsection (a)(8). This subsection provides for termination where (1) "the child has been removed from the care of the parent by the court or under a voluntary agreement with an agency"; (2) "12 months or more have elapsed from the date of removal or placement"; and (3) "the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child." 23 Pa.C.S.A. § 2511(a)(8). In considering whether this standard is met, we may not consider the parent's efforts "first initiated subsequent to the giving of notice of the filing of the petition." *Id.* at § 2511(b).

The Agency presented evidence that the conditions that led to Child's removal included Mother's inability to provide adequate nutrition and stable housing, her refusal to acknowledge Child's medical needs, and her need for mental health treatment. Testimony from multiple sources supported the trial court's conclusion that Mother "has not addressed several parenting deficiencies, including a proper understanding of [Child]'s diagnosis of failure to thrive." Order at ¶ 3. The Agency presented evidence that as of the date of the filing of the petition, which pre-dates the implementation of pandemic restrictions in Pennsylvania, Mother had not complied with the directives to obtain stable housing or follow through with mental health treatment and was in denial regarding Child's medical needs.

Finally, the evidence reflects that termination of parental rights would best serve the needs and welfare of the child. In contrast to the evidence of Mother's inabilities, there was significant testimony that Child was primarily and securely attached to her foster parents, with whom she had resided since she was seven months of age. We therefore conclude that the Agency has presented clear and convincing evidence that termination is warranted under Subsection (a)(8).

### 6. 23 Pa.C.S.A. § 2511(b)

Finally, Mother argues the court erred in concluding that the Agency met its burden to present clear and convincing evidence that termination was in Child's best interests. Mother argues that she "shows great love and affection for" Child and that Dr. Rosenblum testified that "Mother and Child were

comfortable with each other and Mother's behavior was appropriate during Mother's encounters with Child." She adds that Child also had a bond with Mother's sister, and states that "if Mother's parental rights are terminated, Child's Puerto Rican heritage and culture will be lost to Child." Mother's Br. at 22-24.

If the court determines grounds for termination exist under any subsection of 23 Pa.C.S.A. § 2511(a), the court must then determine whether there is clear and convincing evidence that termination is in the child's best interests, pursuant to 23 Pa.C.S.A. § 2511(b). In making this determination, the court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." ***Id.*** "One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond." ***In re L.M.***, 923 A.2d at 511.

The evidence reflects that there would be minimal effect to severing any bond between Mother and Child. As discussed above, the testimony firmly supports the court's findings that Child is primarily and securely attached to her foster parents, with whom she had resided since she was seven months old. Mother's arguments regarding cultural heritage issues are undeveloped. She presented no evidence of the cultural heritage of any prospective foster or adoptive parents, the likelihood that others of different background will not connect Child with her heritage, or that harm from cultural losses, should they occur, outweighs Child's need for stability. We cannot say that the lower court

- 17 -

abused its discretion in finding that it was in Child's best interest to terminate Mother's parental rights and allow Child to move toward adoption.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 08/09/2021