J-A09027-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: B.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: C.P., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1268 WDA 2024 |

Appeal from the Order Entered September 17, 2024
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000095-2023

BEFORE: KUNSELMAN, J., NICHOLS, J., and LANE, J.

MEMORANDUM BY NICHOLS, J.:                    **FILED: June 16, 2025**

Appellant C.P. (Mother) appeals from the order terminating her parental rights to B.P. (Child).[1]  On appeal, Mother contends that the Allegheny County Office of Children, Youth, and Families (CYF) failed to establish grounds to terminate Mother's parental rights by clear and convincing evidence.  We affirm.

The trial court summarized the relevant facts and procedural history of this matter as follows:

> The parties have stipulated that [Child is] a two-year-old boy who was born [in] October [of] 2021.  The parties have also agreed that there was no father listed on [Child's] birth certificate.  However, [Child's] biological father was determined through genetic testing that was completed on December 1, 2022.  On [the day Child] was born, CYF obtained a verbal order for emergency

---

[1] Child was born in October of 2021, and was two-years and eight months old at the time of the June 21, 2024 termination of parental rights hearing.  ***See*** Joint Stipulation, 6/20/24, at 2.

protective custody. Two days later, [C]hild was placed in foster care.[2] [Child] was adjudicated dependent on November 17, 2021. CYF filed the petition for involuntary termination of parental rights on April 27, 2023.

Kaitlyn Joyce, a CYF casework supervisor, testified that the family was first brought to CYF's attention in November 2019 as a result of truancy, housing, and substance abuse concerns for Mother's eldest child. CYF was still active with the older sibling when [C]hild was born. [Child] was brought under CYF's care because of [CYF's] previous involvement with Mother and [CYF's] ongoing concerns for untreated mental health, drug, and alcohol usage, and housing. Additionally, CYF was concerned about Mother's level of functioning related to her intellectual disability and her inability to meet basic needs for both her[self] and her eldest child. These concerns were ultimately what led to CYF obtaining a verbal emergency custody authorization.

At the shelter care hearing, Mother was first ordered to work with Achieva, a program that offered parenting curriculum and support for individuals with intellectual disabilities. CYF initially referred Mother to Achieva in September of 2021. At the time of [C]hild's birth, Mother was already on a waiting list for the program. In May of 2022, the referral for Achieva was put on hold at Mother's request due to her sustaining an arm injury. CYF requested that Achieva reengage with Mother in December of 2022. Mother subsequently completed an intake with Achieva on January 25, 2023. On February 10, 2023, the program visited Mother and [C]hild. In April 2023, the Achieva referral closed. CYF talked to Mother about reengaging with the program and re-establishing a visit schedule to attend. However, Mother did not follow through with it.

At the November 17, 2021[] adjudication hearing, Mother was ordered to engage with drug and alcohol treatment, maintain sobriety, cooperate with [CYF], and continue to participate in mental health treatment. As of the June 21, 2024, contested [termination of parental (TPR)] hearing, Mother had not provided any documentation that showed she completed a drug and alcohol program. Mother relapsed twice in recent history: once in May of 2023, and another time in February 2024 after using alcohol,

_____

2 Child has been in foster care since he was two-days old. *See* N.T., 6/21/24, at 82; Trial Ct. Op., 11/25/24, at 1 (unpaginated).

marijuana[,] and cocaine. [Mother] disclosed to Ms. Joyce that she was experiencing ongoing triggers and struggling with her substance abuse. She also indicated that she was depressed and had a hard time getting out of bed, showering, and meeting her basic needs. Mother's statements regarding her depression were []part of an ongoing conversation that began early in 2023.

At the time of the contested TPR hearing, Mother resided at Sojourner House MOMS.[3] One of the requirements for entering Sojourner House MOMS was having a substance use diagnosis. Mother had access to relapse prevention and other helpful groups during her time there. Mother initially complied with the program but, in late 2022, she indicated that she no longer wanted to participate. She also reported that she no longer attended groups or engaged in other mental health treatments. Mother's decision to stop participating in the program stemmed from her fear of potentially being asked to leave Sojourner House MOMS after she and her eldest son damaged property inside of their apartment.

Ms. Joyce testified that CYF additionally referred Mother to POWER[4] for drug and alcohol treatment. Mother had her most recent POWER assessment in March 2024. Ms. Joyce discussed the recommendations from the assessment with her. Mother acknowledged that she would benefit from a dual diagnosis program and indicated a willingness to participate. CYF re-referred her to in-home services to help Mother get connected with dual diagnosis programs in the community. CYF also offered Mother the following services: Homebuilders, a Joint Planning Team, multiple rounds of traditional in-home services, and [services] for her eldest son.

CYF did not receive documentation showing that Mother completed mental health treatment. However, Mother did work with several service coordinators . . .. Mother also had a few

---

[3] Sojourner House is a residential recovery service for mothers and their children in the Pittsburgh area. *See Interest of S.S.W.*, 85 WDA 2022, 2022 WL 4127232, at *2 (Pa. Super. filed Sep. 12, 2022) (unpublished mem.); *see also* Pa.R.A.P. 126(b) (stating this Court may rely on unpublished decisions of this Court filed after May 1, 2019, for their persuasive value).

[4] Pennsylvania Organization for Women in Early Recovery ("POWER"). *See Interest of J.S.*, 325 WDA 2024, 2024 WL 3935953, at *1 (Pa. Super. Aug. 26, 2024) (unpublished mem.)

sessions with a therapist that Sojourner House MOMS provided to her in 2023. In May 2024, CYF learned that Mother reengaged with a mental health program provided by Three Rivers Youth on March 22, 2024, and that she attended two or three of those sessions.

In regard to visitation, CYF offered Mother Friday and Saturday visits. [Mother] did not attend the Saturday visits because she did not like traveling to CYF's East Regional Office, which is where the visits were held. CYF offered to identify an alternative day for the visit to take place and help her figure out the bus line, but Mother did not propose a new day or time. Though Mother indicated that she was willing to attend the Friday visits, she did not attend any of the visits that were offered by CYF. Mother indicated that [C]hild becoming upset during the visits was one of the reasons she did not want to attend them. In the six months prior to the filing of the TPR petition, there were 59 possible visits. Mother only attended three of them. There was a supervised visit at the foster mother's home, but that visit was initiated by the foster mother. Mother also did not send any cards, letters, or gifts to [C]hild throughout the six months. However, there were instances where she exchanged photos of [C]hild with the foster mother. The foster mother also attempted to facilitate video calls between Mother and [C]hild on or around his birthday.

Ms. Joyce further testified that CYF maintained consistent contact with Mother throughout the life of the case and only lost contact with her for a few months. Furthermore, Mother actively participated in family planning meetings. CYF held 15 family planning meetings in total and Mother attended 13 of those meetings. The family plan[ning] meetings occurred on the following dates: February 18, 2020, May 28, 2020, August 17, 2020, November 24, 2020, February 19, 2021, May 24, 2021, August 18, 2021, November 23, 2021, February 17, 2022, March 16, 2022, May 26, 2022, August 26, 2022, February 24, 2023, and August 15, 2023.

At the time of the contested TPR [hearing on June 21, 2024], [C]hild was in the care of his Adoption Connection[] foster parents. [C]hild had been in their care since October [of] 2021[, a period of more than thirty-two months]. In August 2023, the foster parents were named educational and medical decisionmaker for the subject child. Ms. Joyce informed the court that [C]hild was on target developmentally, up to date medically,

and was thriving in his foster home. She further testified that [Child] had a good relationship with his foster siblings.

The foster parents separated sometime after the subject child was placed in their care and now lived in two different homes. Each foster parent set up a room for [C]hild at their respective places of residence. Ms. Joyce observed [C]hild enjoying a meal in both homes, engaging in play, and requesting play from both of his foster parents, engaging in a dance with them, seeking affection, sitting on their laps, asking for hugs, and sharing food. She testified that CYF never had any concerns about the foster parent's care of [C]hild. Both foster parents continued to be a pre-adoptive resource for [C]hild and expressed a desire to be an adoptive resource.

At the time of the TPR hearing, [C]hild had been in foster care for 32 months. Throughout that time, [Child] established a bond with his foster parents and even began referring to them as mother and father. Thus, CYF believed that termination best served [C]hild's needs and welfare and recommended that both parents' rights be terminated.

The court also heard testimony from Tarraca Jackson, a supervisor at the Allegheny County Health Department's Drug and Alcohol Screening Laboratory. Ms. Jackson testified that Mother registered with the office around February 12, 2020. Since that time, Mother was called in for a total of 81 screens, with the last one conducted on June 18, 2024. Out of the 81 screens, Mother only attended nine. Mother tested positive for cocaine for two of those nine screenings which occurred on May 8, 2023, and February 12, 2024.

Dr. Ntei Abudu, a lab director at Labcorp, testified that his office received a specimen from Mother on February 14, 2024. Labcorp was asked to test the specimen for cocaine and fentanyl. The specimen tested positive for cocaine but not fentanyl.

CYF also called Dr. Terry O'Hara, a licensed psychologist, to testify. Dr. O'Hara conducted evaluations for [C]hild and each member of the family. He then issued reports based on each evaluation. The reports were issued on April 28, 2023, November 16, 2023, January 2, 2024, and June 14, 2024. Dr. O'Hara also completed multiple interactional evaluations with [C]hild and his foster parents. He found that [C]hild engaged well with both of his foster parents, and that each foster parent exhibited positive parenting skills.

Dr. O'Hara further testified that the two important factors for a secure attachment between a child and an adult was (1) a caregiver or parent who could provide a safe haven for the child, and (2) a secure base that allowed the child to exhibit autonomy and independence. Bond and attachment are often used interchangeably. However, Dr. O'Hara explained that there was a difference between the two. While bond referred to the parent or caregiver's relationship with a child, attachment referred to the child's relationship with an adult. Throughout the evaluations, Dr. O'Hara witnessed an attachment between [C]hild and his foster parents. [C]hild engaged well with the foster parents and appeared happy to be around them. Dr. O'Hara noted that there were several indicators of security present in [C]hild's relationship with his foster parents. He also believed that the foster parents were an appropriate adoptive resource for [C]hild. This belief was based on observations he had made over time which included [C]hild's engagement with his foster parents, the foster parents' parenting skills, and positive remarks that were made by Adoption Connection [caseworkers] about [C]hild's interactions with both foster parents.

Dr. O'Hara was not concerned about the foster parents' potential as adoptive resources for [C]hild because both [foster parents] have exhibited housing and employment stability. They also did not engage in criminal activity, intimate partner violence, or have any psychiatric hospitalizations. On November 16, 2023, Dr. O'Hara completed an individual evaluation of Mother. At that time, he was concerned about several things including Mother's lack of independent housing, her mental health, and the fact that she was not involved with any mental health services. Dr. O'Hara was also concerned when Mother expressed to him that she was overwhelmed and wanted [C]hild to be adopted.

Additional concerns pertained to (1) [C]hild's behavior during the interactional [evaluation] with Mother, and (2) Mother's responses on the PAS.[5] During the interactional [evaluation], [C]hild was initially playful but, at some point, he began crying and approaching the door to the room with a clear intent to leave. Dr. O'Hara noted that Mother was slow to redirect him and was also

_____

[5] Although the trial court did not define the term "PAS" in its opinion, the record reflects reference to the "Personality Assessment Screener" during Mother's counsel's cross-examination of Dr. O'Hara. *See* N.T., 6/21/24, at 44.

unsuccessful in her attempts to quiet him down. He instructed Mother to show [C]hild toys as a means to distract him, but she decided to end the evaluation prematurely instead of engaging with [C]hild further. As for the PAS, Mother's responses were in the "clinically significant range." This was a result of there being "indications of suicidal thinking, lack of support, potential psychotic features, anger management, depression, [and] anxiety." All of these issues were issues consistent with other parts of Dr. O'Hara's evaluation of Mother.

In terms of a diagnosis, Dr. O'Hara diagnosed Mother with a mild intellectual disability, an unspecified depressive disorder, a rule out diagnosis of generalized anxiety disorder, mild opioid use disorder, and a mild alcohol use disorder. However, Dr. O'Hara's diagnosis was limited because he was not able to get in contact with the Sojourner House or Achieva, as neither organization responded to his messages.

Dr. O'Hara recommended dual diagnosis treatment for Mother which had both mental health and drug and alcohol components. The treatment also looked at things like relapse prevention and how to stay clean. Dr. O'Hara was concerned about Mother's mental health symptoms. He stated that a person finding it hard to get out of bed because of depression would "need a higher level of care." He was not sure if Mother had depression, but he noted that "when one has difficulties getting out of bed, it can refer to one having serious depression, specifically a major depressive episode." An episode like that could make it difficult for a caregiver to prioritize the needs of a child.

At the time of the evaluations, Dr. O'Hara did not believe that Mother was in a position to care for [C]hild's needs and was against unsupervised visits until the concerns he had [identified] were remedied. He further stressed that children thrive in environments where they have safety, stability, and security, which are all factors inherent in permanency. Dr. O'Hara recommended permanency for the subject child due to the fact that he had been out of parental care for a significant amount of time.

The final witness called to testify was Catherine Kellner, a case aide supervisor at Adoption Connections PA who was responsible for all transportation and visitations. Ms. Kellner started overseeing [C]hild's case on June 1, 2024. She testified that her office removed Mother from the visitation schedule in September

2023 because of a lack of compliance. The schedule was mostly Fridays from 9:00 a.m. to 11:00 a.m. starting in January of 2023. Prior to January, there were Tuesday visits through Arsenal that began in September of 2022 and ended on December 13, 2022. In 2021, Mother attended 17 out of 23 scheduled visits. The visits that Mother did not attend were due to parent issue or fault. In 2022, Mother attended 24 out of 95 scheduled visits. Two of the 95 scheduled visits were cancelled by Adoption Connections. In 2023, Mother attended four out of 71 scheduled visits. The last visit Mother attended occurred on June 23, 2023. Adoption Connections stopped working with the family in September of 2023.

Trial Ct. Op., 11/25/24, at 2-12 (unpaginated) (footnotes omitted and formatting altered).

On September 17, 2024, the trial court filed a order granting CYF's petition to involuntarily terminate Mother's parental rights to Child pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), and (8).[6] Mother filed a timely notice of appeal, and both the trial court and Mother complied with Pa.R.A.P. 1925.

On appeal, Mother presents the following issues:

1. Did the trial court abuse its discretion and/or err as a matter of law in granting the petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), and (8)?

2. Did the trial court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of [Child] pursuant to 23 Pa.C.S. § 2511(b)?

---

[6] The September 17, 2024 order also terminated the parental rights of Child's biological father and an unknown father. *See* Order, 9/17/24, at 1-2. However, neither is a party to the instant appeal. *See* Trial Ct. Op., 11/25/24, at 1 (unpaginated).

Mother's Brief at 6 (some formatting altered).[7]

We begin with our well-settled standard of review:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

_____

[7] We note that children have a statutory right to counsel in contested involuntary termination of parental rights proceedings. *See In re K.R.*, 200 A.3d 969, 984 (Pa. Super. 2018) (*en banc*); 23 Pa.C.S. § 2313(a). However, "during contested termination-of-parental-rights proceedings, where there is no conflict between a child's legal and best interests, an attorney-guardian *ad litem* representing the child's best interests can also represent the child's legal interests." *In re T.S.*, 192 A.3d 1080, 1092 (Pa. 2018).

Here, the record reflects that Lexus Cersosimo, Esq. of Kidsvoice, was identified as Child's Guardian *ad* Litem (GAL) at the TPR hearing, was appointed to represent both Child's best and legal interests, and Attorney Cersosimo noted on the record that there was no conflict. *See* Pre-trial Order, 8/30/23; Order Appointing Legal Counsel, 8/30/23; *see also* N.T., 6/21/24, at 1, 3. We note that the trial court did not conduct an on-the-record determination as to whether Attorney Cersosimo could represent Child's best interests and legal interests without conflict. *See*, *e.g.*, *In re H.H.N.*, 296 A.3d 1258, 1263-64 (Pa. Super. 2023). However, our Supreme Court has recognized that there is a presumption that there is no conflict between a child's best interests and legal interest when a child is too young to articulate a preference in the outcome of the proceedings. *T.S.*, 192 A.3d at 1088-90. Because Child was only two years and eight months old at the time of the termination hearing, we conclude that the presumption of no-conflict from *T.S.* applies. *See id.*

*In re H.H.N.*, 296 A.3d 1258, 1263 (Pa. Super. 2023) (citation omitted); *see also In re Q.R.D.*, 214 A.3d 233, 239 (Pa. Super. 2019) (explaining that "the trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence" (citation omitted and some formatting altered)).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). We need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm an order terminating parental rights. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

## 23 Pa.C.S. § 2511(a)(2)

In the instant case, Mother argues that she remedied the conditions that led to Child's removal, and she contends that the trial court's order should be reversed. *See* Mother's Brief at 15-19. Mother argues that the evidence was

insufficient to support the conclusion that there was a continued incapacity to provide essential parental care to Child. *Id.* at 18.

Section 2511(a)(2) provides as follows:

**§ 2511. Grounds for Involuntary Termination.**

**(a) General rule.**--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

* * *

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S. § 2511(a)(2).

To satisfy the requirements of [Section] 2511(a)(2), the moving party must prove (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. The grounds for termination are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied.

*In re C.M.K.*, 203 A.3d 258, 262 (Pa. Super. 2019) (citations and quotation marks omitted).

Additionally, this Court has explained:

Unlike subsection (a)(1), subsection (a)(2) does not emphasize a parent's refusal or failure to perform parental duties, but instead emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being. Therefore, the language in subsection (a)(2) should not be read to compel courts to ignore a child's need for a

- 11 -

stable home and strong, continuous parental ties, which the policy of restraint in state intervention is intended to protect. This is particularly so where disruption of the family has already occurred and there is no reasonable prospect for reuniting it[.]

*In re E.A.P.*, 944 A.2d 79, 82 (Pa. Super. 2008) (citations omitted and formatting altered).

Further, this Court has stated that a "child's need for consistent parental care and stability cannot be put aside or put on hold." *In re K.M.W.*, 238 A.3d 465, 474 (Pa. Super. 2020) (*en banc*) (citation omitted and some formatting altered).

Thus, while "sincere efforts to perform parental duties," can preserve parental rights under subsection (a)(1), those same efforts may be insufficient to remedy parental incapacity under subsection (a)(2). "Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental responsibilities." *In re A.L.D.*[, 797 A.2d 326, 340 (Pa. Super. 2002)]. A "parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." *Id.*

*In re Z.P.*, 994 A.2d 1108, 1117-18 (Pa. Super. 2010) (some citations omitted and formatting altered).

Here, the trial court addressed Mother's argument regarding Section 2511(a)(2) as follows:

Section 2511(a)(2) permits termination of parental rights when a parent has repeatedly shown an incapacity to parent that leaves a child without essential parental care and cannot be remedied. Grounds for termination "due to parental incapacity that cannot be remedied are not limited to affirmative misconduct." [*In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa. Super. 2015)]. It may also include "acts of refusal as well as incapacity to perform parental duties." [*Id.*]

- 12 -

In [**Matter of Adoption of M.A.B.**, 166 A.3d 434 (Pa. Super. 2017)], the trial court denied the agency's petition to terminate because "the parents moderately complied with the permanency plan [...] and had made moderate progress toward alleviating the conditions which led to placement." [**Id.** at 437.] [The trial court] also stated that "there was a reasonable probability the causes and conditions which led to placement could be remedied, and the family could be restored." [**Id.** at 445.] The Superior Court reversed this decision, pointing to the Adoption Act's "clear delineation of what must be shown at a termination proceeding." [Id.] The Act does not consider whether the evidence supports a finding that a parent will resolve their issues in the future but rather, it looks at the facts established at the time the termination petition was filed. [**Id.**]

The [m]other's goal in **M.A.B.** included substance abuse treatment, mental health, and parenting programs. [**Id.**] [The mother] received some parental education and, for a period of time, had successful visits with the children. [**Id.**] However, she "refused to address her substance abuse and mental health issues with consistency." [**Id.**] The caseworkers in [**M.A.B.**] testified that [the m]other would not be able to meet the children's needs in a "safe, healthy manner" due to her refusing to address her mental health and substance abuse. [**Id.** at 446] Based on this evidence, the Pennsylvania Superior Court found that [the m]other's incapacity still existed at the time the petition was filed. [**Id.**] It also found that the agency met its burden pursuant to 23 Pa.C.S. Section 2511(a)(2). [**Id.**]

In the present case, Mother asserts that "there was not clear and convincing evidence that the conditions and causes of any incapacity, abuse, neglect, or refusal cannot or will not be remedied by Mother." Th[e trial c]ourt disagrees. Mother has refused to comply with her Family Service Plan goals several times throughout the life of this case. These goals are not optional or merely there for a parent to complete at their leisure. They pave the way to reunification, which has always been the primary goal in dependency cases. Family courts recognize the importance of returning children to their families when it is in the child's best interest to do so, and part of that "best interest" calculus involves safety. A child has "a right to have proper parenting and fulfillment of his or her potential in a permanent, healthy safe environment." [**B.L.W.**, 843 A.2d at 388.] None of the witnesses provided testimony that indicated Mother was capable of providing

a healthy or safe environment for [C]hild. In fact, the testimony the trial c]ourt heard spoke to the contrary.

Pursuant to Dr. O'Hara and Ms. Joyce's testimony, Mother has serious mental health and drug and alcohol issues that need to be addressed to ensure [C]hild's safety. Not only has Mother struggled to take care of herself but she relapsed twice before the petition was filed. "Substance abuse [...] does not automatically cause the child to be 'without essential parental care, control, or subsistence necessary for his or her physical or mental well-being.'" [**See** Pennsylvania Dependency Benchbook, pg. 133].[8] However, a parent who refuses to perform their parental duties, which includes their assigned goals, is parentally unfit. [**B.L.W.**, 843 A.2d at 387-88.] Furthermore, this [c]ourt sincerely believes that Mother needs help. And since [Mother] has failed to provide documented proof that she has completed mental health and drug and alcohol treatment, there is no guarantee that she is receiving the care that she needs in order for her to be a reliable and safe parent to [C]hild.

Trial Ct. Op., at 19-20 (unpaginated) (footnotes omitted and some formatting altered).

The trial court further stated:

Here, [C]hild has been out of Mother's care for almost three years. This was a sufficient amount of time for Mother to remedy some, if not all, of the conditions that necessitated removal. Mother would need at least a few more years of treatment and services to achieve a semblance of parental fitness. Keeping [C]hild in limbo to allow Mother more time to meet her court-ordered goals when there is no guarantee that she will complete them serves no other purpose than to undermine the progress that [C]hild has made in his [foster] placement.

**Id.** at 20 (unpaginated) (some formatting altered).

---

[8] **See also** Pennsylvania Dependency Benchbook, 4th Edition (2024) (Interactive – Ch. 17.10.2).

Following our review of the record, we discern no abuse of discretion by the trial court, and we conclude that the trial court's findings are supported by the record. *See H.H.N.*, 296 A.3d at 1263; *Q.R.D.*, 214 A.3d at 239.

The record reflects that Ms. Joyce testified that Mother failed to establish successful completion of her court-ordered drug and alcohol treatment, and Mother reported a relapse in February 2024. *See* N.T., 6/21/24, at 67. Ms. Joyce also testified that there was no indication that Mother completed her court-ordered mental health treatment. *See id.* at 72.

Dr. O'Hara expressed several concerns about Mother's ability to care for Child now and in the future, and he noted concerns about Mother's lack of independent housing, her emotional breakdowns, psychiatric hospitalizations, and history of substance and alcohol abuse. *See id.* at 29-30. Dr. O'Hara also noted that Mother was not involved with any mental health services at the time of his evaluation. *See id.* at 30. Dr. O'Hara diagnosed Mother with an intellectual disability, mild history of depressive disorder, and mild opioid and alcohol use disorder. *See id.* at 31. Dr. O'Hara testified regarding concerns he had while observing Mother's interaction with Child and stated that during the interaction, when Child began crying, Mother chose to end the interaction early and, once Mother left, Child stopped crying. *See id.* at 34. Dr. O'Hara concluded that he would not recommend that Mother have unsupervised contact with Child, and he stated that there was no evidence that Mother was in any position to care for Child. *See id.* at 37.

Further, Ms. Kellner testified that Mother failed to visit Child on a consistent basis and did not attend most visits. *See* N.T., 6/21/24, at 54-56. Ms. Kellner testified that Mother attended sixteen out of twenty-three visits offered in 2021, twenty-four out of ninety-three visits offered in 2022, and one out of sixty-five visits offered in 2023. *See id.*

As noted, Child has been in foster care for almost his entire life. Child was placed in foster care upon being released from the hospital only two days after his birth, Child has never been in Mother's care, and Mother has not remedied the conditions that led to Child's removal. *See* N.T., 6/21/24, at 82, 85; *see also* Trial Ct. Op., at 21-24 (unpaginated). A "child's need for consistent parental care and stability cannot be put aside or put on hold." *K.M.W.*, 238 A.3d at 474 (citation omitted and some formatting altered). Moreover, a court is not required to postpone adoption indefinitely. *See id.* For the reasons stated above, we discern no abuse of discretion by the trial court in concluding that termination was appropriate under Section 2511(a)(2).[9] *See H.H.N.*, 296 A.3d at 1263; *K.M.W.*, 238 A.3d at 474. Accordingly, Mother is not entitled to relief.

## 23 Pa.C.S. § 2511(b)

We next review the trial court's conclusion that involuntarily terminating Mother's parental rights best serves Child's developmental, emotional, and

_____

[9] We reiterate that we need only agree with the trial court as to one subsection of Section 2511(a), as well as Section 2511(b), to affirm an order terminating parental rights. *See B.L.W.*, 843 A.2d at 384.

physical needs and welfare pursuant to Section 2511(b).  Section 2511(b) states:

> **(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(b).

> This Court has explained:
>
> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
>> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent.  Additionally, . . . the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*C.D.R.*, 111 A.3d at 1219 (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011)), *abrogated in part on other grounds by In re K.T.*, 296 A.3d 1085 (Pa. 2023).

Our Supreme Court has stated that "if the child has any bond with the biological parent, the court must conduct an analysis of that bond, which 'is

not always an easy task.'" **K.T.**, 296 A.3d at 1106 (quoting **In re T.S.M.**, 71 A.3d 251, 267 (Pa. 2013)). In **K.T.**, our Supreme Court explained that "a court conducting the Section 2511(b) needs and welfare analysis must consider more than proof of an adverse or detrimental impact from severance of the parental bond." **Id.** at 1113. Indeed, the **K.T.** Court emphasized that "the parental bond is but one part of the overall subsection (b) analysis, which includes a determination of whether the bond is necessary and beneficial to the child, *i.e.*, whether maintaining the bond serves the child's developmental, physical, and emotional needs and welfare." **Id.**

"Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." **T.S.M.**, 71 A.3d at 268 (citation omitted). Courts must consider "the child's need for permanency and length of time in foster care[;] whether the child is in a pre-adoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical and emotional needs, including intangible needs of love, comfort, security, safety, and stability." **K.T.**, 296 A.3d at 1113 (footnote omitted and formatting altered).

In weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." **T.S.M.**, 71 A.3d at 269. "Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." **Id.**

The trial court addressed Section 2511(b) in relevant part as follows:

In **In re G.M.S.**, [193 A.3d 395] (Pa. Super. 2018)], the Court found that termination of [the m]other's parental rights was proper because she did not have a substantial bond with the children compared to the bond they established with their pre-adoptive homes. [**Id.** at 402-03.] Here, [C]hild does not have a significant relationship with Mother, which is expected for a child who has no[w] been out of her care for almost three years and has not had many opportunities to interact with her in that time.

Given Dr. O'Hara and Ms. Joyce's testimonies, it is clear that [C]hild's day-to-day needs are being met by the foster parents. The three years that [C]hild has spent in their care has established a strong attachment such that [Child] now refers to [the foster parents] as mother and father. Thus, this [c]ourt does not believe that terminating Mother's rights will have an adverse impact on [Child].

Trial Ct. Op., at 21 (unpaginated) (some formatting altered).

Based on our review of the record, we discern no abuse of discretion by the trial court in concluding that termination of Mother's parental rights would best serve Child's developmental, physical, and emotional needs and welfare. **See K.T.**, 296 A.3d at 1113; **T.S.M.**, 71 A.3d at 267. As the trial court noted, Child does not have a significant relationship with Mother. **See** Trial Ct. Op., at 21 (unpaginated). As noted previously, Child has been in foster care for his entire life, beginning when he was released from the hospital two days after he was born, and Child has never lived with Mother. More precisely, at the time of the TPR hearing, Child had been in foster care for thirty-two months. **See** N.T., 6/21/24, at 82, 86. The record reflects that Child is happy and thriving living with his foster family, Child gets along with his foster

siblings, and that the foster parents are the educational and medical decision makers for Child. ***See id.*** at 83.

Further, although the foster parents have separated from each other, both foster parents continue to be a pre-adoptive resource. ***See id.*** at 83-85. Dr. O'Hara testified that Child has a bond with foster parents and even after foster parents separated, Dr. O'Hara testified that he had no concerns about the foster parents being an adoptive resource for Child. ***See id.*** at 28-29. Further, Ms. Joyce explained that Child and Child's foster siblings are the foster parents' top priority. ***See id.*** at 85. Moreover, Child is bonded with foster parents, views the foster parents as mother and father, and refers to them as such. ***See id.*** at 86. Child also looks to the foster parents for love and affection, Child is on target developmentally, he continues to meet his milestones while in foster parents' care, and Child continues to thrive in foster parents' care. ***See id.*** The record supports the trial court's conclusion that termination of Mother's parental rights best meets the needs and welfare of Child, and termination will not have an adverse impact on Child. ***See id.*** at 86-87; Trial Ct. Op., at 21 (unpaginated).

For these reasons, we discern no abuse of discretion by the trial court in concluding that termination was appropriate under Section 2511(b). ***See H.H.N.***, 296 A.3d at 1263. Therefore, Mother is not entitled to relief, and we affirm the order terminating Mother's parental rights to Child pursuant to 23 Pa.C.S. § 2511(a)(2) and (b).

Order affirmed. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

6/16/2025