J-S29033-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: D.F., A MINOR | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: D.M., MOTHER | : : : : : : : | |
| | : | No. 443 WDA 2025 |

Appeal from the Order Entered March 14, 2025
In the Court of Common Pleas of Allegheny County
Orphans' Court at CP-02-AP-0000078-2024

BEFORE:  NICHOLS, J., SULLIVAN, J., and BENDER, P.J.E.

MEMORANDUM BY BENDER, P.J.E.:                **FILED:  October 9, 2025**

D.M. (Mother) appeals from the order which granted the petition of the Allegheny County Office of Children, Youth & Families (CYF) and terminated Mother's parental rights to D.F. (Child).[1]  After careful review, we affirm.

Case History

Child was born in May 2023 and placed in CYF's care within days of his birth.  The hospital had "refused to release Child until someone from [CYF] had an opportunity to speak with hospital staff regarding this particular family."  Orphans' Court Opinion (OCO), 5/13/25, at 3.  The orphans' court explained:

> CYF was aware of Mother and family because of her extensive history with [CYF].  Mother had seven prior involuntary parental

---

[1] The orphans' court also terminated the parental rights of Child's father, T.F. (Father), who has not appealed.

terminations.  CYF knew that Mother had a significant history of inter-partner violence (IPV) with Father.  …

A Shelter Care hearing was held on May 24, 2023.  Child was placed in the care and custody of [J.]L. ([F]oster [M]other), a Three Rivers Adoption Council (TRAC) family home, and has remained there ever since.

Mother was ordered to undergo IPV classes, counseling services through Achieva, and continue to work with support services through the Office of Intellectual Disabilities (OID) and Staunton Clinic.

Mother's housing was also an issue….  CYF had growing concerns after the Shelter Hearing that Mother and Father resided together in the same house due to [the couple's] significant history of domestic violence.

*Id.* at 4-5 (footnotes omitted).

Child was adjudicated dependent on June 7, 2023.  The court ordered Mother to participate in the services set forth in the shelter care order, and provided for Mother's supervised visits with Child twice a week.  *See* Order, 6/7/23, at 2.  The court also ordered CYF to assess Mother's housing situation and provide Mother with transportation for services.  *Id.* at 3.

CYF conducted regular family plan meetings to assist Mother in meeting her goals, and the court held six permanency review hearings between September 21, 2023, and February 6, 2025.  *See* OCO at 5.  On August 26, 2024, CYF petitioned to terminate Mother's parental rights.  The orphans' court held a hearing on March 13, 2025.  CYF presented testimony from CYF caseworker, Deborah McAllister; Achieva parent support specialist, Kristy Klacik; TRAC foster care supervisor, Amy Szymanski; and licensed psychologist, Patricia Pepe.  Mother testified in opposition to termination but

did not present additional witnesses. Child's counsel, who represented Child's best and legal interests, "submit[ted] that [Child] deserves permanency through adoption."[2] N.T. at 165.

On March 14, 2025, the orphans' court entered an order terminating Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), (5), (8) and (b). Mother filed a timely appeal and concise statement of errors pursuant to Pa.R.A.P. 1925(a)(2)(i).

Mother presents the following questions for review:

1. Did the [orphans'] court abuse its discretion and/or err as a matter of law by involuntarily terminating Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2)?

2. Did the [orphans'] court abuse its discretion and/or err as a matter of law by involuntarily terminating Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(5)?

3. Did the [orphans'] court abuse its discretion and/or err as a matter of law by involuntarily terminating Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(8)?

4. Did the [orphans'] court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of [Child] pursuant to 23 Pa.C.S. § 2511(b)?

Mother's Brief at 6.

_____

[2] Counsel explained that there was no conflict with Child's best and legal interests because Child was 22 months old and "unable to state a position for [counsel] to advance." N.T., 3/13/25, at 165; *In re Adoption of K.M.G.*, 240 A.3d 1218, 1224 (Pa. 2020) (explaining that counsel may represent a child's best and legal interests when the interests do not conflict).

<u>Discussion</u>

Mother argues that CYF failed to present sufficient evidence to support termination of her parental rights. Mother states:

> CYF failed to meet its burden under any section of 23 Pa.C.S. § 2511(a)[,] thus negating the need for the [orphans'] court to make a finding under 23 Pa.C.S. § 2511(b). There was ample evidence to demonstrate that [Child] has a beneficial and important relationship with Mother that needs to be preserved to best serve the needs and welfare of [Child].

Mother's Brief at 16.

To the contrary, CYF argues that it presented clear and convincing evidence to support termination pursuant to 23 Pa.C.S. § 2511(a)(2), (5), (8) and (b). CYF notes that when Child came into care in May 2023, Mother was provided with various services, yet "parenting, housing and IPV concerns continued to exist" when CYF petitioned to terminate Mother's parental rights in August 2024. CYF's Brief at 10. CYF further asserts that witness testimony demonstrated that termination was in Child's best interests. *Id.* at 23-25.

Likewise, Child's counsel argues that "the record is replete with competent evidence to support the [orphans'] court's decision, and the [orphans'] court correctly followed the law." Participant's Brief at 13.

On appeal, we consider the parties' arguments mindful of the following:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest

unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized [an appellate court's] deference to [orphans'] courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). The orphans' court "is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G. & J.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted).

When considering a petitioner's request to terminate parental rights, the orphans' court must first determine whether there are grounds for termination under 23 Pa.C.S. § 2511(a). The evidence must be clear and convincing. *See In re T.S.M.*, *supra*. If the court finds grounds for termination under Section 2511(a), it must then consider the child's needs and welfare under Section 2511(b). This Court need only agree with the orphans' court as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm the termination of parental rights. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

Here, the record supports the orphans' court's determination that throughout "the lifetime of this case, Mother demonstrated only moderate compliance with the permanency plan and minimal progress toward alleviating the circumstances which necessitated [Child's] placement." OCO at 5-6. For example, the record supports the court's finding of grounds for termination under Section 2511(a)(2) (providing for termination where the repeated and

continued incapacity of the parent has caused the child to be without essential parental care, and the conditions and causes of the incapacity cannot or will not be remedied).  The orphans' court explained:

> The court ordered Mother to complete the goals identified by CYF for reunification.  At the time of the Shelter Hearing, Mother was ordered to cooperate with CYF's investigation, to undergo behavioral health treatment[, attend] supervised visitation [with Child] twice weekly, and address IPV through the Women's Center & Shelter of Greater Pittsburgh (hereinafter, "WC&S").

> Mother was ordered to address her behavioral health.  Mother was diagnosed with an intellectual disability called pragmatic language disorder and communication disorder.  Mother has functional limitations and difficulty communicating with others due to this limitation, which affects the social aspects of her relationships and occupational performance.  The court accepted testimony from CYF Caseworker Deborah McAllister that Mother had been compliant with working with Achieva and Staunton Clinic.  Kristy Klacik, a Parent Support Caseworker with Achieva[,] credibly testified that Mother has not completed her parenting curriculum.

> The court accepted the testimony that Mother demonstrated some compliance with certain aspects of her behavioral health goals through Achieva and Staunton Clinic; however, the court is more concerned with Mother's failure to complete the goals necessary for reunification, most importantly, Mother's historical IPV issues and parenting.

> In this case, Mother was ordered to undergo IPV counseling due to the significant history of abuse between herself and Father.  Mother refused to participate in and complete IPV counseling.  Mother was referred to the WC&S.  Of note, Mother had been referred to the WC&S on two prior occasions.  Caseworker McAllister testified that Mother told a staffer at the WC&S, named "Tre", that she did not feel that she needed to complete the program a third time.  Mother testified that she spoke to "Tre" in relation to IPV counseling, and it was at his suggestion that she forgo taking the class again since she had taken it five times in the past.  The court does not credit Mother's version of the events and she failed to present any witnesses to support her testimony.

> Mother testified that she would be willing to do "everything she needed to do" including cooperation with "any IPV provider." The court rejected Mother's testimony as she was offered those services over the course of the past 22 months and now promises to complete [them]. The court rejected Mother's vow to cooperate as untimely or disingenuous.
>
> Mother was ordered to address independent housing. Mother continued to reside at a house that was leased in Father's name. CYF Caseworker McAllister testified credibly that Mother was provided in-home services to secure housing. Mother refused to accept the services and told CYF that she didn't want to move, … and frankly wasn't interested in moving.

*Id.* at 13-15 (footnotes omitted).

The orphans' court "was unmoved by Mother's testimony," found that she "lacked credibility," and declared that "the court has no reason to believe that Mother will remedy the issues in the near future." *Id.* at 18. In contrast, the court credited the testimony of Ms. McAllister, who stated that she "had been on the case since [Child] was removed at birth." N.T. at 5. Ms. McAllister observed that Mother "was pretty consistent showing up [for] appointments." *Id.* at 23. However, she noted that Mother "refused to [pursue appropriate] housing." *Id.* Ms. McAlllister explained that "for [Mother] to move forward with unsupervised visits, we needed [her] to have her own housing with [Child,] because she couldn't have unsupervised visits in the home" with Father.[3] *Id.* at 24.

Ms. McAllister confirmed that Mother never progressed to having unsupervised visits with Child. *Id.* at 32. She also testified that Mother's

---

[3] Ms. McAllister explained that CYF could "not exclude [Father] from the house ever at any time" because "it's his home." *Id.* at 36-37.

reunification with Child was impeded by Mother failing to "complete the IPV [counseling], because [Mother] felt that she completed it in the last situation with her other [child]." *Id.* at 34. According to Ms. McAllister, Mother had not remedied the conditions which led to Child's removal from Mother's care.[4] *Id.* at 35.

The record supports the orphans' court's termination of Mother's parental rights under Section 2511(a)(2). The court found "no credible evidence or testimony to demonstrate Mother sufficiently remedied the goals relevant to Child's removal," and further concluded that Mother could not or would not remedy her parental incapacity because she "failed to recognize or acknowledge her duties as a parent[, never] acted in a caregiver role[, and] failed to present any evidence to the contrary." OCO at 16. The orphans' court did not abuse its discretion.

As to Child's needs and welfare, the orphans' court "conclude[d] that the developmental, physical, and emotional needs and welfare of Child would be best served by terminating Mother's parental rights under Section 2511(b)." *Id.* at 27. The orphans' court explained:

> The court gave primary consideration to the developmental, physical, and emotional needs and welfare of the Child from his perspective. The court examined whether there was an emotional bond between Mother and Child as part of its best interest analysis, but that is only one of many factors the court considered in making its determination. The court also examined the safety needs of the Child as well as other intangibles that the Child has

---

[4] Similar to Ms. McAllister, Dr. Pepe opined that Mother was not "in a position to care for Child [currently or] in the near future." *Id.* at 108.

with [F]oster [M]other, such as love, comfort, security and stability. The court's determination included the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the Child. Although Mother loves Child, evidence of a [parental] bond by Child towards Mother does not exist. The court concluded that [Child's] trust and emotional support rests with [F]oster [M]other. ... As Dr. Pepe observed, Child views [F]oster [M]other as his biological mother and his psychological parent. [F]oster [M]other … is the only parental figure [Child] has known. Child has felt safe and secure for the last 23 months and has not only acclimated, but more importantly thrives in her care.

… The court relied upon [Dr. Pepe's] expert opinion and found that Child will not suffer extreme and emotional consequences by severing the bond [with] Mother.

OCO at 25-26.

Dr. Pepe evaluated Mother individually, and conducted interactional evaluations of Child with Mother and Child with Foster Mother. Regarding a bond between Child and Mother, Dr. Pepe stated, "I think [the relationship is] more reflective of [Child] being familiar with her and more reflective of a visitation situation as opposed to viewing her as a primary caretaker and exhibiting a primary attachment." N.T. at 105. When CYF's counsel asked Dr. Pepe about the effect of severing a bond with Mother, Dr. Pepe replied, "I don't think that there would be a severe problem." *Id.* at 109. Conversely, Dr. Pepe described Child as having a "primary attachment" with Foster Mother. *Id.* at 106. Dr. Pepe testified that Child viewed Foster Mother as his "psychological parent." *Id.*

Pertinently, Dr. Pepe opined that "permanency through adoption would address the best psychological interests of [C]hild." *Id.* at 108. She explained:

> [T]he purpose of conducting child forensic evaluations is to address the best interests of the child. [Child] has been placed since his birth. There's been consistency and permanency. He's exhibited a primary attachment [to Foster Mother]. I would be very concerned if that primary attachment was taken away or, somehow [Child] was detached from [Foster Mother,] because he would be at risk for greater psychological problems in the future and in the present.
>
> … There's no question [that Mother] loves [Child]. But when we address [C]hild's needs, I just see that his needs would be better met through permanency [with Foster Mother].

*Id.* at 108-09.

Ms. McAllister's testimony was consistent with Dr. Pepe's testimony. Ms. McAllister testified to visiting Child in his placement with Foster Mother every 30 days. *Id.* at 34. She described Child as having "a normal, healthy attachment" to Foster Mother. *Id.* She also stated that "all of his needs are being met." *Id.* at 35. Ms. McAllister confirmed that Foster Mother's home "is the only place [Child] has ever lived." *Id.* at 54. She opined that termination would serve Child's needs and welfare. *Id.* at 35-36.

The foster care supervisor, Amy Szymanski, also conducted home visits with Child and Foster Mother. Ms. Szymanski testified:

> There's a strong bond. I've been in the home doing home visits [when Child] ran into a wall … because he wasn't paying attention, and he started crying. He looked at [Foster Mother] and he went to her for comfort and sought her out. He's very quick to … when

people show up and they're new[,] hide behind [Foster Mother] because she's … his safe space.

*Id.* at 89.  Ms. Szymanski reiterated that Child "is definitely loving towards [Foster Mother].  He's always running to her, hugging her.  He does look to her for basically everything at this point in his little life."  *Id.* at 93.  Like Ms. McAllister, Ms. Szymanski testified that Foster Mother meets all of Child's needs.  *Id.* at 90.

As indicated from the above evidence, the orphans' court did not abuse its discretion in concluding "that the developmental, physical, and emotional needs and welfare of Child would be best served by terminating Mother's parental rights under 23 Pa.C.S. § 2511(b)."  OCO at 27.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE:  10/09/2025

- 11 -